# People's Natural Gas Company *v.* American Natural Gas Company, Appellant.

*Equity—Notice—Specific performance—Natural gas companies—Corporations—Contracts.*

1. A court of equity has jurisdiction to specifically enforce a contract to supply natural gas.

2. A party taking with notice of an equity takes subject to that equity.

3. A court of equity has the power to prevent a natural gas company from disposing of substantially all of its property for the purpose of escaping from complying with its contracts and defrauding its creditors; and if such company sells its property to another natural gas company which has notice of existing contracts for supplying gas, the vendee company will be compelled to specifically perform these contracts.

Argued Oct. 13, 1911. Appeal, No. 200, Oct. T., 1910, by defendant, from decree of C. P. Armstrong Co., Sept. Term, 1906, No. 25, on bill in equity in case of People's Natural Gas Company v. American Natural Gas Company. Before FELL, C. J., BROWN, MESTREZAT, POTTER, ELKIN, STEWART and MOSCHZISKER, JJ. Affirmed.

Bill in equity for an injunction and for specific performance.

Patton, P. J., filed the following opinion:

### FINDINGS OF FACT.

1. The Manufacturers' Natural Gas Company was chartered on August 28, 1896, for the purpose of producing and transporting natural gas in the county of Armstrong.

2. Shortly after its incorporation, it proceeded to drill wells on the West side of the Allegheny river, for the supply of natural gas, and drilled five wells, from which it supplied a pottery with fuel.

3. The said Manufacturers' Natural Gas Company, also shortly after its incorporation, to wit, in the years 1896, 1897 and 1898, obtained leases in Valley and Kittanning townships, Armstrong county, on the east side of the Allegheny river, about eight miles distant from its wells on the west side of the Allegheny river, and obtained thereon a number of wells producing natural gas in paying quantities.

4. The People's Natural Gas Company is also incorporated under the act of May 29, 1885, and authorized under its charter to produce, transport and supply natural gas in Armstrong county, and other counties in Western Pennsylvania.

5. On November 26, 1898, the said Manufacturers' Natural Gas Company entered into a written contract with the People's Natural Gas Company, to sell to it (the People's Company) "all the gas that may be produced from the following tracts of land, situate in Kittanning and Valley townships, Armstrong county, Pa., . . . . from the date of this agreement to the 1st day of April, 1905, and as long thereafter as the party of the first part shall each month derive, as revenue from this agreement, a sum which shall be equal to twice the royalties and running expenses incurred by first party." The People's Company agreed to pay three and one-half cents per thousand cubic feet; the meter to be furnished jointly; The Manufacturers' Company to furnish and lay the lines

from the several wells to the meter station; the People's Company to receive a certain amount of gas per day; if the rock pressure fell below 100 pounds, the People's Company to construct pumps from which to draw the gas from the wells of the Manufacturers' Company, and force it into the lines of the People's Company; Manufacturers' Company further agreed that if it drilled additional wells on the described properties, that the gas from them should be delivered to the People's Company.

6. On August 10, 1899, the said Manufacturers' Company entered into a further written agreement with the said People's Company, wherein it agreed to sell to the People's Company "all the gas that may be produced from the following described tracts of land in Kittanning and Valley and Boggs townships, Armstrong county (a list of said properties being attached to the agreement), and all leases that the Manufacturers' Company may hereafter secure in the said townships, to sell said gas until the first day of April, 1905, and as long thereafter as the party of the first part shall each six months derive as revenue from its agreement a sum which shall be equal to twice the royalties and running expenses incurred by the Manufacturers' Company; Manufacturers' Company agrees that its eight wells now completed shall be continuously connected with the pipe lines of the People's Company; Manufacturers' Company also agrees to drill six additional wells within five months. In consideration whereof, People's Company agreed to pay three and one-half cents per thousand cubic feet; People's Company to furnish 2,640 feet of three-inch pipe line for each well thereafter drilled: People's Company to furnish an eight-inch line to connect up the Frank Moorhead well; People's Company agree to receive a certain amount of gas, and Manufacturers' Company not required to furnish more than a certain amount (naming amounts). People's Company agrees if rock pressure falls below 100 lbs., that it will construct pumps to draw the gas from the wells of the Manufacturers' Company into the lines of the People's Company." It

was further agreed that the contract of November 26, 1898, was superseded by this agreement.

7. That afterwards, to wit, February, 1904, the Manufacturers' Company became financially involved, and R. A. McCullough, Esq., was appointed a receiver for it by the court of common pleas of Armstrong county.

8. On December 31, 1904, said R. A. McCullough, receiver of said Manufacturers' Natural Gas Company, entered into a contract with the said People's Natural Gas Company, reciting the existence of the contract of August 10, 1899, and agreeing that it should remain in full force and effect except as herein altered. McCullough, as receiver, agreed to sell all the gas produced upon the leases in Kittanning and Valley townships, up to 1,000,000 cubic feet per day, to take effect December 31, 1904, for the term of one year, and as long thereafter as said party of the first part should derive as revenue from the agreement a sum that shall be equal to twice the royalties and running expenses incurred by the party of the first part in operating its said plant in supplying gas; that the gas from the wells completed or thereafter to be completed on said tracts should be delivered to the People's Company; People's Company to pay four cents per 1,000 cubic feet; People's Company to furnish at its own expense, a three-inch pipe line to each well hereafter drilled, the pipe to remain its property; People's Company to take at least 1,000,000 cubic feet per day, and all the gas the wells will produce for sixteen hours per day; each to pay one-half the costs of superintending the meters and regulators; People's Company also agreed to construct and maintain pumps to draw the gas from the wells of first party; a violation of the terms of the agreement to work a forfeiture; "This agreement shall extend to and be binding upon the successors and assigns of the Manufacturers' Natural Gas Company and the People's Natural Gas Company."

9. That said receivership of R. A. McCullough, Esq., terminated on June 19, 1905, and all the estate of the

said Manufacturers' Natural Gas Company reverted to it on said day, free and discharged from any control of the said receiver.

10. The People's Natural Gas Company complied with all their covenants in the agreements recited in findings of fact five, six, eight, and received gas from the Manufacturers' Company to the amount of about 1,000,000 feet per day during the continuance of said contracts.

11. After the termination of the receivership, the Manufacturers' Company furnished gas to the People's Company under the same terms and conditions as existed during the receivership.

12. The People's Company was furnishing about 50,000,000 to 75,000,000 feet of gas per day to their customers. The source of supply was about 1,000,000 feet from the Manufacturers' Company, 8,000,000 feet from their own wells, and under contracts with other gas companies, and the balance from their own wells in the West Virginia field.

13. Prior to the making of the contract between the Manufacturers' Company and the American Natural Gas Company (hereafter fully recited in the fourteenth finding of fact), the American Natural Gas Company had full and complete notice of the contracts existing between the Manufacturers' Company and the People's Company, and had knowledge of the conditions existing in the gas fields, and made said contract with full knowledge of the rights of the People's Gas Company.

14. On April 18, 1906, the Manufacturers' Natural Gas Company sold to the American Natural Gas Company, for the consideration of $55,000, "All and singular the herein described leases, leaseholds, properties, estate, rights, franchises and privileges, that is to say, all and singular all the oil and gas wells, leases, leaseholds, real estate, pipe lines, pumps, machinery, tools, fixtures, meters, regulators, and appliances of every description, constituting the plant and property of the Manufacturers' Natural Gas Company of Armstrong County, wherever situate,

except its property lying and being West of the Allegheny River, together with all municipal ordinances, grants of right of way." The Manufacturers' Company further agreed that it had an indefeasible, merchantable title to the whole of the property conveyed, with a full right to convey and assign the same and warranted to defend the same.

15. The above contract (recited in the fourteenth finding of fact), conveyed to the American Gas Company, the wells and leases of the Manufacturers' Gas Company, in Boggs, Valley and Kittanning townships, the gas output of which the said Manufacturers' Company had heretofore sold to the People's Company, under the contracts recited in the fifth, sixth and eighth findings of fact.

16. After the making of the contract of April 18, 1906, the American Company took possession of all the wells, lines and other property of the Manufacturers' Company (except that on the west side of the Allegheny river).

17. The American Natural Gas Company carried out the several contracts of the Manufacturers' Company with the People's Company, until April 27, 1906, when it wrote the People's Company that it had purchased all the property of the Manufacturers' Company east of the Allegheny river, and required it (the People's Company) to disconnect its lines from the lines purchased by the American Company from the Manufacturers' Company, not later than June 1, 1906, and in the meantime it would charge the People's Company five cents per 1,000 feet for the gas used.

18. On May 31, 1906, the American Company rendered a bill to the People's Company for 27,066,817 feet of gas at four cents per 1,000 supplied at Fiscus Meter Station, up to April 2, 1906, $1,082.67, which was paid by the People's Company to the American Company on June 8, 1906.

19. On June 11, 1906, the American Company notified the People's Company that unless some amicable arrangement was made, it would, on June 15, shut off the gas

formerly delivered by the Manufacturers' Company to the People's Company, at the meter on the Fiscus farm.

20. On June 14, 1906, the injunction in this case was granted restraining the American Company from shutting off the gas as threatened.

### CONCLUSIONS OF LAW.

1. The plaintiff has no adequate remedy at law.

2. A court of equity has jurisdiction to specifically enforce a contract to supply natural gas.

3. That the American Natural Gas Company having entered into the contract of April 18, 1906, with notice of the rights and equities of the People's Natural Gas Company, under the contracts of August 10, 1899, and December 31, 1904, said American Natural Gas Company took the property in dispute subject to such equities, and could contract for only that which the Manufacturers' Company could honestly transfer, viz., its interest, subject to the equities of the People's Natural Gas Company as they existed on said April 18, 1906.

4. That a court of equity has the power, and should exercise it to prevent a corporation from disposing of substantially all its property for the purpose of escaping from complying with its contracts, and defrauding its creditors, when the corporation purchasing said property had notice of the contracts prior to the purchase, and is made a party to the bill.

### DISCUSSION.

We are of the opinion, that it is no longer a debatable question in Pennsylvania that an injunction is the proper remedy to prevent the breach of a contract made by a natural gas company with a consumer, by enjoining it from shutting off the gas. In Whiteman v. Fayette Fuel Gas Company, 139 Pa. 492, the gas company was enjoined from breaking such a contract, and in Sewickley Boro. Sch. Dist. v. Ohio Valley Gas Company, 154 Pa. 539, the defendant was enjoined from shutting off the supply

of gas in violation of the terms of its contract. In Conemaugh Gas Company v. Jackson Farm Gas Company, 186 Pa. 443, it was held that a court of equity has jurisdiction to specifically enforce a contract to supply natural gas, for the reason that it is the most convenient remedy for a just disposal of the questions involved.

The pinch of the case now before us is whether or not the defendant, the American Natural Gas Company, the vendee of the Manufacturers' Natural Gas Company, can be restrained from taking the gas which the People's Company had contracted for prior to the accruing of the rights of the American Company, the American Company having knowledge of said rights before it purchased.

We have stated the facts fully in our finding, and they need not be repeated at length here. If the Manufacturers' Company had been brought before us before they entered into the contract with the American Company, there can be no doubt that they should have been enjoined from violating the contract. Is their vendee, the American Company, in any better position? If so, a great wrong will be perpetrated by the defendant, upon the plaintiff, for the defendant has obtained virtually all of the property of the Manufacturers' Company, and if the only remedy of the plaintiff is to run the chance of a recovery against the Manufacturers' Company, its loss will be total, for it is apparent from the evidence, that property of little if any value remains in the hands of the Manufacturers' Company.

The evidence is undisputed that the American Company entered into the contract with full knowledge of the equities, rights and contracts of the People's Company. It is an important rule of equity that a party taking with notice of an equity takes subject to that equity. The meaning of this doctrine is, that if a party acquiring property has at the time of its acquisition notice of a prior equity binding the owner in respect to that property, he shall be assumed to have contracted for that only which the owner could honestly transfer, viz., his interest, sub-

ject to the equity as it existed at the date of the notice. "It is a doctrine of a court of equity, that whatsoever is the agreement concerning any subject real and personal, though in form purely personal and suable only at law, yet in this court it binds the conscience and as against the party himself and any claiming under him voluntarily or with notice raises a trust:" Lagard v. Hodges, 1 Vesey Jr. 477. In Tulk v. Moxhay, 2 Phillips' Ch. Reps. 778, it was said: "The question does not depend upon whether the covenant runs with the land; if there was a mere agreement and no covenant this court would enforce it, against a party purchasing with notice of it; for if an equity is attached to the property by the owner, no one purchasing with notice of that equity can stand in a different situation from the party from whom he purchased."

In Northern Central Railway Co. v. Walworth, 193 Pa. 207, which was an injunction to restrain the sale of stocks and bonds in disregard of a prior contract, it was held: "That subsequent sale and delivery of the securities to other parties in disregard of the earlier contract with the plaintiff is not of the least consequence as a defense, most especially as the bill avers that these parties had knowledge of the prior contract with the plaintiff and are made parties to the bill and are asked to be enjoined."

This principle runs through all the books: "A party taking with notice of an equity, takes subject to that equity." The full meaning of this just rule is that the purchaser of an estate or interest, legal or equitable, even for a valuable consideration, with notice of an existing or equitable estate, interest, claim or right in or to the subject-matter, held by a third person, is liable in equity to the same extent and in the same manner as the person from whom he made the purchase, his conscience is equally bound with that of the vendor, and he acquires only what his vendor can honestly transfer:" 2 Pomeroy's Eq. Juris. (3d ed.), sec. 688.

In Adams' Eq. 151, it is said: "The meaning of the doctrine 'that a party taking with notice of an equity,

takes subject to that equity,' means that if a person at the time of acquiring property has notice of a prior equity binding the owner in respect to that property, he shall be assumed to have contracted for that only which the owner could honestly transfer, viz., his interest, subject to the equity as it existed at the time of the notice."

Applying the law as above stated to the facts of this case, it is not difficult to decide.

The officers of all three of the gas companies involved in this controversy, were familiar with the methods of obtaining a supply of natural gas and transporting it to market. For a period covering nearly eight years, the Manufacturers' Company had entered into a number of contracts with the People's Company, mutually beneficial, whereby the People's Company by expending a large amount of money in the purchasing and installing of a pump station, regulators, meters and other fixtures, and by purchasing pipe and laying the same to the wells of the Manufacturers' Company, had increased its (People's Company) supply of gas by about 1,000,000 feet per day. Along comes the defendant, the American Natural Gas Company. It examines these contracts, and finds that they are in force, and that a legal duty rests upon the Manufacturers' Company to continue to furnish the gas to the People's Company. They also find that the agreement of December 31, 1904, "shall extend to and be binding upon the successors and assigns of the Manufacturers' Natural Gas Company." If the American Company bought with the understanding that they would carry out the contract of the Manufacturers' Company, they are bound to do so. However, if they bought substantially all the property of the Manufacturers' Company as a subterfuge to allow it to escape from the fulfillment of its contract, then it would be a fraud upon the rights of the People's Company, for which in our opinion, a court in equity has the power to prevent.

It must be presumed that the American Company only purchased that which the Manufacturers' Company

had a legal right to sell, viz., the gas output not prior thereto sold to the People's Company, and when it paid $55,000 under the contract, it paid only for that which the Manufacturers' Company could honestly sell, viz., its interest, subject to the equities of the People's Company of which the American Company had notice.

So if we apply the law as heretofore stated, the American Company is liable in equity to the same extent and in the same manner as the Manufacturers' Company, its conscience is equally bound with that of its vendor, and the American Company only acquired what the Manufacturers' Company could honestly transfer. It cannot be doubted that the Manufacturers' Company could not honestly dispose of its property, for the purpose of defrauding the People's Company out of the fruits of its contracts, to obtain which it had expended a large amount of money. And I am of the opinion that the testimony leads to the conclusion that such was its intention when it entered into the contract with the American Company. What the purpose of the American Company was in making the contract on their part, we cannot tell. If their purpose was an honest one, then they should carry out the covenants and stipulations that their vendor had made, and of which they had notice prior to the payment of the purchase money. If their purpose was dishonest, and they were acting in concert with the Manufacturers' Company to defraud the People's Company out of its rights, by placing the property of the Manufacturers' Company out of reach, then a court of equity will step in and use its strong arm to prevent the perpetration of such fraud.

In the case of Xenia Real Estate Co. v. Macy, decided by the supreme court of Indiana, and reported in 47 N. E. Repr. 147, the defendant and its vendee, were enjoined from shutting off the supply of natural gas under facts somewhat similar to those now before us.

### DECREE.

And now, August 6, 1910, this matter came on to be

heard, and after consideration of the evidence, and arguments of counsel, it is ordered, directed and decreed that a perpetual injunction issue, restraining the respondent, the American Natural Gas Company, its officers, agents and employees, from shutting off or in any wise interfering with or diminishing or diverting the supply of natural gas from the said wells now supplying gas to the complainant, and from disposing of said natural gas to any other person, firm or corporation, or from wasting the same or any part thereof, and that it shall permit the plaintiff, the People's Natural Gas Company, to take all the natural gas provided to be delivered to it under the terms of the contracts of August 10, 1899, and December 31, 1904, and upon the conditions, prices and stipulations therein contained.

That the respondent, the American Natural Gas Company, pay the costs.

*Error assigned* among others was the decree of the court.

*Walter Lyon,* with him *John P. Hunter* and *Heiner & Golden,* for appellant.

*Orr Buffington,* with him *Oliver W. Gilpin* and *Christy Payne,* for appellee.

PER CURIAM, January 2, 1912:

The decree is affirmed on the opinion of the learned judge of the common pleas.