**AMERICAN REFINING CO. et al. v. TIDAL WESTERN OIL CORPORATION. (No. 2320.)**

(Court of Civil Appeals of Texas. Amarillo. May 14, 1924. Rehearing Denied June 11, 1924.)

**1. Mines and minerals ☞48—Oil and gas are minerals constituting part of realty.**

Oil and gas are minerals, and while in place are a part of the realty, and one who acquires an interest in them by proper conveyance has a legal estate and interest in the land under which they are situated.

**2. Mines and minerals ☞83—Casinghead gas contract held to run with land.**

Casinghead gas contract, conveying the casinghead gas in consideration of services to be performed by grantee, and binding the "assigns" of the parties, *held* a conveyance of an estate and interest in the land running with the land and binding grantor's successors in interest; the gas conveyed thereby being the gas in place.

**3. Mines and minerals ☞83—Covenant or condition relating to development of mineral resources in consideration of work to be done or on royalty basis is a covenant running with land.**

A covenant or a condition which relates to the development of the mineral resources of lands in consideration of work to be done thereon or on a royalty basis is a covenant which runs with the land.

**4. Mines and minerals ☞52—Defendant's appropriation of plaintiff's gas enjoined.**

A defendant will be enjoined from appropriating gas to which plaintiff is entitled under casinghead gas contract, where contract does not stipulate for liquidated damages, though granting of injunction will result in a specific performance of the contract, since in such case the plaintiff has no adequate remedy at law, and injunction is an appropriate remedy to restrain the continuous trespass.

Error from District Court, Wichita County; E. W. Napier, Judge.

Suit by the Tidal Western Oil Corporation against the American Refining Company and others. Judgment for plaintiff, and defendants bring error. Affirmed.

Weeks, Morrow & Francis, of Wichita Falls, for plaintiffs in error.

Bonner, Bonner & Sanford, of Wichita Falls, and Y. P. Broome, of Tulsa, Okl., for defendant in error.

HALL, C. J. Defendant in error, Tidal Western Oil Corporation, brought this suit against plaintiffs in error, Roy Perdue and American Refining Company, to recover actual and exemplary damages and for an injunction, restraining the Refining Company from refusing to deliver casinghead gas under what is known as a casinghead gas contract, and from interfering with the right of the Tidal Company to take such gas. The Tidal Company alleged that it was the successor in title to G. W. Snedden, who on the 6th day of September, 1919, entered into a casinghead gas contract with the IXL Oil Company, covering 2.96 acres of land involved in this suit; that at said time the IXL Oil Company had contracted with one Carl Williamson, who held a usual 88 form lease on said land to drill certain wells upon what is known as a fifty-fifty basis, and that, as a matter of necessity and as a result of such relation, and on account of the custom prevailing in the field, said IXL Oil Company was authorized to bind, not only its interest in said lease, but also the interest of Williamson; that later by conveyance title to all of said lease got in one Abe Breman, who executed a division order, ratifying and adopting said original contract so that the same was by virtue of said ratification adopted and binding as to the whole ⅞ interest. It was further alleged that the Refining Company, without right or authority, joined by Roy Perdue, who was also sued, denied the right of the Tidal Company to take the casinghead gas, disconnected and removed the pipes of the Tidal Company, and that the contract was breached knowingly, purposely, and wantonly, so as to justify exemplary damages. Facts are also set up tending to show that damages would be inadequate on account of the alleged fact that the casinghead gas was necessary to the operation of valuable property which had been constructed at a cost of about $1,500,000, upon faith of the contract. The Refining Company is the successor in title to Abe Breman. The Refining Company filed a general denial, and specially denied that it was bound by or had in any wise taken subject to or assumed the casinghead contract; denied that it was binding upon the interest of Carl Williamson in the property in any event; and denied that the contract had been ratified or adopted. It pleaded the statute of frauds and statute of conveyances as reasons why any transaction other than a writing would be valid to bind

the Williamson interest. It sets up its honest belief, based upon the advise of counsel, that it was entitled to the casinghead gas, free from any claim of the Tidal Company, and alleged that the division order constituted a new contract subject to be terminated by either party at any time in substitution of the old.

The casinghead gas contract, which forms the basis of this action, was executed September 6, 1919, between the IXL Oil Company, party of the first part, and G. W. Snedden, party of the second part, and contains the following stipulations material to the questions urged upon this appeal:

"And, whereas, the first party desires to sell, transfer and assign unto the second party, for the manufacture of gasoline and other products, the casinghead gas and storage which now exists and which may hereafter be produced from oil wells located upon said premises, upon the terms and conditions hereinafter appearing,

"Now, therefore, in consideration of the premises and of the covenants, agreements, and payments hereinafter mentioned, to be well and truly kept, performed, and paid by second party, first party hereby sells and covenants and agrees to and with second party to supply and deliver unto second party, and second party hereby purchases and agrees to receive at the price and upon the terms and conditions hereinafter set out, all of the casinghead gas and gas coming from the oil wells with the oil and gas that evaporates from the oil during storage, suitable and sufficient for the manufacture of casinghead gasoline, which may be produced from oil wells now or hereafter to be located or drilled upon the lands above described, said casinghead gas to be delivered by first party into the lines of the second party, at casinghead of each well, and at any point of discharge of oil from such well, determined by second party.

"Second party agrees to furnish all lines and make all connections with the casinghead of wells, and to construct and lay the necessary lines and make the proper and necessary connections between its lines and said wells, for the removal and conveyance of such casinghead gas from such wells to the vacuum plant of the second party, and at any point of discharge of oil from the well, determined by the second party.

"Second party agrees to install, maintain, and operate at its own expense a vacuum station, pumps, machinery, and appliances required to create and maintain upon the wells on said premises a constant and steady vacuum, at least sbstantially equal to the degree of vacuum which may be used or maintained by the operators upon any well upon adjoining lands offsetting said premises.

"Second party agrees to pay to first party for each thousand cubic feet of casinghead gas received hereunder a price to be determined and fixed by the schedule of price to be paid for casinghead gas, as provided by 'Figure 1,' attached to and made a part thereof, and said 'Figure 1' as by reference hereby incorporated into and made a part of this contract and agreement as fully and to all intents and purposes as though in detail written herein. The

price of a gallon of gasoline for the purposes of said 'figure 1' shall be the Chicago tank wagon price for Red Crown gasoline, in cents per gallon, shown in the first column of said 'figure 1,' minimum of 18 cents per thousand cubic feet.

"For the purposes of determining the gasoline content of the gas from each lease sold hereunder by first party to second party, * * * a physical test shall be made at the time second party begins to receive casinghead gas under the terms of this contract and agreement, and as often as three months thereafter, if demanded by either party thereto, and the first party shall be entitled to five days' notice of such proposed test, and to have its representative present at the time such test is made. The tests made constitute the basis of settlement for all casinghead gas delivered to second party by first party for period following test and up to and until such time as a later test is made.

"For the purpose of measuring and ascertaining the quantity of casinghead gas furnished and delivered by first party to second party, second party agrees to furnish and set and maintain a standard meter of sufficient capacity for the purpose required upon each of said leaseholds and the cost of expense of furnishing, setting, and operating such meters shall be paid by second party. * * * The gas taken by second party shall be paid for on a basis of measurement at four ounces pressure above atmosphere pressure. If the gas is measured at pressure higher or lower than four ounces above atmosphere pressure, the proper multiplier shall be used to determine the actual amount of gas to be paid for.

"Second party shall, on or before the 20th day of each month, settle and pay for all casinghead gas delivered to it during the next preceding calender month. At the time of making such payments second party shall furnish first party with the daily reading during the period covered by such payment of the meters provided for the measurement of such casinghead gas. First party, or its duly authorized representative, shall have the right at all reasonable times to inspect and examine the books and records of the second party pertaining to the measurement and quantity of casinghead gas which has been delivered to second party, and shall have the right to examine and test the meters installed by second party for the purpose of measuring such casinghead gas. It shall be the duty of the second party to keep all meters correct within 3 per cent., plus or minus. Should the meter at any time be in bad order or out of service, the amount of gas being delivered daily by the first party for the last preceding 30 days during which the meter was registering correctly shall be averaged, and this average shall be the daily amount paid for covering the period during which the meter was out of service.

"First party shall not be liable in damages to second party by reason of trouble at its wells or from any unavoidable cause interfering with or preventing first party from delivering casinghead gas to second party, but the first party shall use reasonable diligence to keep its wells in good condition, and in case of accident, or from any other cause which may prevent it from delivering such casinghead gas, first party shall remedy the condition as soon

as it is practicable to do so. First party agrees to maintain tight casingheads and casings and use due diligence to prevent air entering vacuum lines.

"First party to grant to the second party the right to lay, construct, repair and and maintain upon and across the leaseholds mentioned herein all necessary lines, vacuum pumping stations and pumps, meters, meter houses, regulating stations and other buildings, structures and lines that may be necessary or convenient for handling casinghead gas taken from said leaseholds and adjoining leases, from which second party is taking gas and the transportation of same to and from its plant, and also the right to erect and maintain a telephone line or lines upon said leaseholds.

"All drip gasoline may be formed or deposited upon leasehold estates hereinafter described shall be and remain the property of the second party.

"Second party agrees to lay a line or lines for its manufacturing plant or plants to extend to a boundary line of each of said leased tracts without cost or expense to the first party, and to return and to deliver to such point dry or residue gas for operating the gas engine which pumps the wells. However, the second party is not bound to return gas for any other purpose than that stated therein, nor to return a greater volume of gas than that received from party of the first part, less shrinkage in transportation lines, loss from the manufacturing process, and the amount used in operation of the plant.

"To the faithful performance of each and every covenant, assignment, the parties hereto bind themselves, their heirs, executors, administrators, legal representatives and assigns, and the same shall be covenants running with said oil and gas lease."

A division order to the Western Oil Corporation was executed on July 1, 1922, by Mrs. Lillis Morgan, guardian, and A. J. Breman, who owned the lease at that time, which provides in substance that said Western Oil Corporation, until further notice, will give credit for all gas purchased from oil wells upon said lease as per the directions therein contained, and further stipulates:

"The Tidal Western Oil Corporation is hereby authorized, until further notice, to receive all gas from oil wells for purchase from said parties severally in the proportions named, subject to the following provisions and conditions:

"First. The gas from oil wells produced and received in pursuance of this division order shall become the property of the Tidal Western Oil Corporation as soon as the same is received into its custody and lines.

"Second. It is understood that this division order is executed subject to a contract made and entered into by and between IXL Oil Company's vendor and Geo. W. Snedden, vendee, which contract is now owned and operated by the Tidal Western Oil Corporation. * * *

"Third. It is understood that all payments for said gas from said wells shall be made to the parties above named in the proportions set forth in accordance with the terms of said contract, for the prices and at the time and under the conditions therein set forth, and

264 S.W.—22

that said contract is hereby ratified and confirmed by the undersigned parties."

In a trial before the court without a jury judgment was rendered for the sum of $50 actual damages and granting the injunction prayed for.

After Abe Breman conveyed the lease to the appellant Refining Company, the said company signed no division orders, and accepted no checks in payment for gas, and about the 13th day of January, 1923, it disconnected the Tidal Company's lines from wells, and began taking the casinghead gas through it own lines and running the same to its own casinghead manufacturing plant. It was admitted that a vacuum, created for that purpose, had a tendency to increase the amount of oil and gas from wells to which it is applied, and a failure to have such a vacuum has a tendency to decrease the oil and gas in wells, especially when other nearby wells are being operated under vacuum suction. No vacuum plants were connected with the wells in question in 1919, though a contract was being made to the end that casinghead gas plants should be erected. After the erection of such plants, and the force of vacuum "pull" is applied to wells, this constantly increases the flow of gas from them. It appears that through this process gas is taken through a pipe line connected with a vacuum pump, at a distance from the wells. The pump creates the vacuum in the pipe line, which is connected with the casinghead of the well, thus creating a vacuum in the well and causing what is known as "pull." The casinghead is the top of the well casing immediately above the ground. In that field the wells are about 1,600 feet deep, and are cased with 6⅝-inch casing from the top of the ground down to the oil sand. The casinghead line is a two-inch pipe which connects the casinghead with the vacuum pump. It was this line which the appellant disconnected. It then connected its own line and took the gas from the casinghead for five or six days before the injunction issued. The gas obtained from the casinghead is measured by a gas meter which is read once a day. It has a dial which registers for eight successive days, and which is changed about every seventh day. This meter belonged to the tidal company. During the time the refining company was taking the gas from the two wells it received an average of 12,000 cubic feet per day. The gas so taken had a gasoline content of nine gallons per thousand cubic feet. There are numerous wells in the vicinity of the wells in question, which are connected to other casinghead plants. It was shown that if such wells were cut off from the vacuum plant they would produce no oil at first. The effect of the vacuum "pull" on other wells in the vicinity is to suck oil and gas away from wells that have little or no "pull." The

force of the vacuum in that field averaged about 25 points, which is said to be heavy "pull." The Refining Company's "pull" was 26 points. The Tidal Company had been paying for gasoline on the basis of 5.042 per thousand cubic feet under a test made about a year prior to the institution of the suit. With only two exceptions, the tendency all over this field, which is known as the Northwest field in Wichita county, has been for the gasoline content to constantly increase. The Tidal Company's meter for three wells showed that they produced approximately 10,000 cubic feet per day, and that they carried "23 points" upon these wells,, which was as much as they could carry. It was shown that, where these wells were located, the Refining Company had from 25½ to 26 points, the McMahon Company 26.2 points, and the Noble plant had 25 points; that all the vacuum plants in the field were trying to get as much "pull" as possible, and that they averaged about 25 points. It was shown that a perfect vacuum is about 29.4 points, and that, when the "pull" is that high, a fraction of a point makes considerable difference in the additional quantity of oil and gas obtained. A plant with a strong vacuum has an advantage over one with a weaker vacuum. The witness Crawley was called to testify as an expert relative to the operation of leases under casinghead contracts. His testimony is in substance as follows:

"There were some 20 to 25 casinghead plants in Wichita county. The tidal company had two plants, and was probably the largest single manufacturer. After a well is drilled in, the casinghead company connects at the casinghead. There are generally two openings at the casinghead. Usually a two-inch line is connected, and a vacuum content as high as 26 to 27 points is created. The gas is sucked back into the vacuum pumps which discharge it into compressors. While it is not necessary to produce casinghead gas, the pump increases the flow of gas. The oil is pumped from the sand and through a two or three inch tube, and casinghead gas comes up through the casing on the outside of the tube, and the vacuum is pulled by the casinghead company ordinarily. If a heavy vacuum is being "pulled" on a nearby well, and an adjoining well be left open, that well produces only a small quantity of gas and oil, and there is a back suction."

On cross-examination he testified that the form of contract involved in this suit is known as "casinghead contract," and is one of the standard forms used. It was prepared by what is known as the Western Oil Corporation, and is a printed form. With reference to the manufacturing process which takes place after the gas is captured at the casinghead and taken in the pipe line back to the manufacturing plant, the casing and the pipes from the casinghead at the well down to the sand belong to the operator, and the manufacturer owns the line from the casinghead back to the plants. The manufacturing process consists of liquifying the gas and separating the dry content from the liquid. A portion of the dry content is returned to the operator, and the liquid is known as casinghead gasoline. This witness further testified as to that provision of the contract providing that the manufacturer should have the gas which evaporates in storage when oil is pumped out of wells and put into storage tanks, and that this gaseous evaporation is what is referred to in the contract.

Counsel have favored us with excellent briefs, and we will discuss the contentions in the order in which they have presented them rather than according to the way the propositions have been numbered.

[1-3] The fifth proposition is the first to be considered. It is as follows:

"The undisputed evidence in this case having shown that the American Refining Company in no wise assumed or took subject to the contract under which the tidal company claimed, and it further appearing that said contract between Snedden and the IXL Company conveyed no interest in the lease, and is not a covenant which runs with the lease, the refining company was in no wise bound thereby."

It was shown that the Refining Company had actual knowledge of the existence of the casinghead contracts, and over the protest of the Tidal Company disconnected the latter's lines and connected the well to its own plant. It is contended under this proposition that the contract and other evidence shows that the casinghead gas is dealt with as and is personalty rather than realty, and that the rights acquired by the Tidal Company vested an interest in personal property only; that the contract created no covenant running with the land which the appellant company was bound to respect. In our opinion the contract is not susceptible to the construction placed upon it by plaintiff in error, nor will the facts sustain the contention. It is settled law in Texas that oil and gas are minerals, and while in place are a part of the realty, and one who acquires an interest in them by proper conveyance has a legal estate and interest in the land under which they are situated. Texas Co. v. Daugherty, 107 Tex. 226, 176 S. W. 717, L. R. A. 1917F, 989; Benavides v. Hunt, 79 Tex. 383, 15 S. W. 396; Dority v. Dority, 96 Tex. 215, 71 S. W. 950, 60 L. R. A. 941; Starke v. Guffey, 98 Tex. 542, 86 S. W. 1, 4 Ann. Cas. 1057; Hennessy v. Blair, 107 Tex. 39, 173 S. W. 871, Ann. Cas. 1918C, 474. We think the covenants contained in the lease are real rather than personal covenants, because at the time the contract was made it had for its object gas which was then inherent in and a part of the land itself. Moreover, both the grantor and the grantee, in virtue of the contract, obtained certain advantages and incurred certain liabilities which bound their assigns by express stipulation,

and besides the value of the lease to both was greatly enhanced thereby; that the defendant in error acquired more than a mere incorporeal hereditament is settled by Judge Greenwood in an exhaustive review of the authorities in Stephens County v. Mid-Kansas Oil & Gas Co. (Tex. Sup.) 254 S. W. 290. By express words in the contract the first party grants to the second party all the casinghead gas "and gas coming from the oil wells with the oil and gas that evaporates from the oil during storage, suitable and sufficient for the manufacture of casinghead gas, which may be produced" from the wells in question. It agrees to keep its wells in good condition, and in case of accident, which would prevent the delivery of such gas, to use due diligence to repair its wells. It grants to defendant in error the necessary easement across its leaseholds for the laying of lines, the erection of pumping stations, installing meters and meter houses, and telephone lines which may be necessary or convenient in the operation of the lease. Defendant in error agreed to furnish all such lines, make all connections with the wells, and maintain a vacuum plant at its own expense necessary to create such a constant and steady suction upon the wells as would equal in degree that of any vacuum plants maintained by operators upon any well owned upon adjoining lands to that in question. It further bound itself to pay a price not less than 18 cents per cubic foot and equal to the schedule of prices fixed by an exhibit referred to in the contract. These, and every other undertaking binding the parties referred expressly, not only to such gas as might, without suction, rise in the casinghead, but a fair construction of the contract shows that they referred to and that the parties were dealing with gas in place. There is no magic in the term "casinghead," and it would do violence to the clear intent of the parties to restrict the object of the lease to only such gas as naturally reached the casinghead of the wells by evaporation. In the very nature of things none of the gas in place could ever reach the reducing plant without passing through the casinghead. The general rule is that a condition in the nature of a covenant binding the grantee to perform certain duties with reference to the land itself runs with the land. Foxcroft v. Mallett, 4 How. 353, 11 L. Ed. 1008. It is the rule by the great weight of authority that a covenant or a condition which relates to the development of the mineral resources of lands in consideration of work to be done thereon, or upon a royalty basis, is a covenant which runs with the land. Pierce-Fordyce Oil Co. v. Woodrum (Tex. Civ. App.) 188 S. W. 245; Thornton, Oil and Gas, § 99; Morrison De Soto, Oil and Gas Rights, pp. 84, 94; Archer's Oil and Gas, p. 366; Bradford Oil Co. v. Blair, 113 Pa. 83, 4 Atl. 218, 57 Am. Rep. 442; Laffan v. Naglee, 9 Cal. 662, 70 Am.

Dec. 678; Crawford v. Witherbee, 77 Wis. 419, 46 N. W. 545, 9 L. R. A. 561. While of course it was understood that a small part of the gas in place would rise when wells were drilled down to the sand, and would be caught in the casinghead as the oil was pumped to the surface, still the amount would be necessarily limited to such an insignificant quantity as would not justify the erection of a plant to reduce it; and the clear inference from the contract is that the installing of an extensive plant for the reduction of gas into gasoline was so expensive that the acquisition of further gas was contemplated. We think the language of the contract itself discloses that both parties contemplated that a vacuum plant would be installed with sufficient power to draw additional gas from its place 1,600 feet below the surface, and that in order to accomplish this result the defendant in error covenanted to connect its vacuum pump with the heads of the appellant's well casing, and bound itself to apply sufficient "pull" to get its share of all gas in that vicinity. When the gas was sold, it was a component part of the oil then lying in place hundreds of feet below the surface, and in order to obtain it appellee is by the contract required to take necessary steps to draw it out of the ground and to the plant. The evidence of the expert shows that in order to do this a powerful suction must be applied to the well, or else the gas would be drawn into other wells in that vicinity which were being operated by competing plants. The conclusion is inevitable that by the contract defendant in error acquired ownership, not only of such gas as might naturally rise and be caught in the casingheads, but its title extended to all the gas then in place. The quantity so purchased was such as it might be able to reduce to possession by drawing it to the surface and into its plant. In its legal effect there is no difference between the contract under consideration and an ordinary oil lease under which the lessee acquires title to the oil which both flows from the well and is pumped from it,

"It is an essential quality of a real covenant that it relates to the realty, having for its object something annexed to or inherent in or connected with land or other real property, and a covenant is said to run with the land when either the liability to perform it or the right to take advantage of it passes to the vendee or other assignee of the land." 7 R. C. L. 1099, § 16.

"In Spencer's Case (4 Coke 16, 1 Smith's Lead. Cas. 9 Ann. Cas. 174), a leading case on the subject, the rule was laid down that, when the covenant extends to a thing in esse, parcel of the demise, annexed and appurtenant to the thing demised, it shall go with the land, and shall bind the assignee, although he be not bound by express words, but, when the covenant extends to a thing which is not in being at the time of the demise made, it cannot be appurtenant or annexed to the thing which has no being." Id., p. 1100, § 17.

"While there is authority to the effect that the first criterion by which to determine whether a given covenant runs with the land or not is the nature and purpose of the covenant, and where this is not decisive, the intent of the parties as expressed in that deed will determine the question—a rule in emulation of that stated in Spencer's Case—under the modern rules of interpretation the order of inquiry above stated is reversed and consideration is given: First, as to whether the parties meant to charge the land; and, secondly, whether the burden is one that can be imposed consistently with policy and principle. And so, where the covenant concerns land, and is one which is capable of being annexed to the estate, and it appears that it is the intention of the parties as expressed in the instrument, then it should be construed as running with and charging the land thereafter in order to carry out such intention. As has been pointed out, many of the authorities adhere to the strict rule that the use of the words 'assigns' is essential in impressing upon a covenant the character of one running with the land; but it can hardly be doubted that there are other considerations of a far more controlling nature. The important consideration is whether the covenant is intended to be and is annexed to the estate. If this be so, the rights and liabilities of those who take the estate and possess the land during the term flow from a privity of estate and not from any assignment of right or contract. * * * Covenants intended to charge the land may be * * * quite as strongly indicated by other language contained in the deed; and generally the intention of the parties is to be ascertained from the tenor of the instrument, the nature of the thing to be done, its relation to the property, the period of its continuance, and the like." Id., p. 1101, § 18.

As was said in Stephens County—Mid-Kansas Case:

"Why hold that instruments in different forms create different estates, where there is no difference in fact with respect to that of which each divests the grantor, his heirs or assigns, nor with respect to that with which each invests the grantee, his heirs or assigns."

Even if it be held that the contract in question imposes a servitude in the nature of an incorporeal hereditament, or the grant is a profit à prendre, nevertheless, as held in Graham v. Omar Gasoline Co. (Tex. Civ. App.) 253 S. W. 896, subsequent purchasers with notice of the rights of the grant are bound by its terms. Whether the true theory of equitable restrictions or servitude imposed upon real property conveyed is the same as that of covenants running with the land, or different as to their historical antecedents, it would seem that the two must have similar limits. Beasley v. Texas, etc., Ry. Co., 191 U. S. 492, 24 L. Ed. 164, 48 L. Ed. 274. The fact that gas in transit from its place under ground must pass through artificial conduits before it can be utilized does not, as a general rule, change its character from real to personal property. Water which has been diverted into ditches or in- to pipes for irrigation purposes is nevertheless held to be realty, and the landowner's right to the use of a portion thereof is a servitude upon such real estate. Mudge v. Hughes (Tex. Civ. App.) 212 S. W. 819; Stanislaus Water Co. v. Bachman, 152 Cal. 716, 93 Pac. 858, 15 L. R. A. (N. S.) 359; Standart v. Round Valley Water Co., 77 Cal. 399, 19 Pac. 689. In the Stanislaus Case it was held that an agreement of the water company to furnish water from its canal, at an agreed price for irrigation purposes, and providing that the obligation imposed upon the company should have the effect of a covenant running with its canal, was not a mere personal covenant, but in substance and effect was an agreement for the sale of real property, binding upon the successor of the company, with notice. In that case the water was to be paid for after its delivery under the contract. See, also, Fawkes v. Reynolds (Cal. Sup.) 211 Pac. 449; Ball et al. v. Rio Grande Canal Co. (Tex. Civ. App.) 256 S. W. 678; Harbert v. Gas Co., 76 W. Va. 207, 84 S. E. 770, L. R. A. 1915E, 570; People's Natural Gas Co. v. American Natural Gas Co., 233 Pa. 569, 82 Atl. 935; Chas. F. Noble Oil & Gas Co. v. Altex Pet. Co. (Tex. Civ. App.) 230 S. W. 758. The same rule obtains in this state with reference to the sale of all standing timber upon land with the right of ingress and egress to cut and remove it. Houston Oil Co. of Texas v. Hamilton, 109 Tex. 270, 206 S. W. 817; Chapman v. Dearman, 111 Tex. 132, 229 S. W. 1112; Lodwick Lumber Co. v. Taylor, 100 Tex. 270, 98 S. W. 238, 123 Am. St. Rep. 803; Adams v. Hughes (Tex. Civ. App.) 140 S. W. 1163. Aside from the technical common-law rules as they relate to real and personal covenants, and the question whether the covenants in this instrument will run with the land, we think there is conveyed an estate and interest in the land itself which courts of equity will sustain and protect. In the Graham v. Omar Case, supra, Connor, C. J., quotes with approval from 7 R. C. 1125, § 39, as follows:

"There is a growing tendency to incorporate equitable doctrines with common-law rules, and in equity covenants relating to land or its mode of use or enjoyment are frequently enforced against subsequent purchasers with notice, whether named in the instrument or not, and though there is no privity of estate. Furthermore, it is immaterial in such cases whether the covenants run with the land or not; the general rule being that it will be enforced according to the intention of the parties."

In the Stephens County—Mid-Kansas Case, supra, it was insisted that the instruments conveyed only incorporeal hereditaments appertaining to the lands, and that the terms of the instruments precluded the vesting of title to the gas and oil save as personalty after being brought to the surface. In disposing of this insistence, Judge Greenwood said:

"Ownership of the gas and oil in place meant having the exclusive right to possess, use, and dispose of the gas and oil. The grantors were clearly divested of the right to either possess, use, or dispose of the gas and oil in place in the lands described in the instruments here involved as soon as the instruments were executed. At the same instant, the right to possess, use, and dispose of such gas and oil in place passed to the grantees in said instruments and to their assigns. Complete divestiture of title to the gas and oil could hardly be more clearly evinced than by the necessity for an express grant or reservation of even enough gas for domestic use in the grantors' dwellings. Dominion over a thing could not well be completer than it is in those persons who may, at their will, assign it to any other person, with or without consideration, for a time which may be forever. Sims v. Sealy, 53 Tex. Civ. App. 518, 116 S. W. 630. The fact that whoever owns the gas and oil, under these instruments, is subject to certain obligations to the former owners, express and implied, with regard to exploration for, and production of, the gas and oil, and with regard to the payment of royalties, in no wise reinvest the former owners with title nor does the possibility of future reversions accomplish present reinvestitures of title in the former owners."

[4] It is further contended that the granting of an injunction is in a negative manner decreeing the specific performace of a contract in which there is a want of mutuality of remedy, and that the court's error is illustrated and emphasized by the fact that the Tidal Company was not able to maintain a vacuum "substantially equal to that furnished surrounding leases." It may be that the granting of the injunction will result in a specific performance of the contract, but this result is merely incidental. The Tidal Company has no adequate remedy at law. The damages which it may suffer are extremely uncertain in amount and practically impossible of ascertainment. It is a matter of common knowledge that in time gas wells will be exhausted, but just when this will occur cannot, in the nature of things, be proven in advance. This contract does not stipulate for liquidated damages, and therefore presents a proper subject of equitable cognizance. Injunction is the appropriate remedy to restrain a trespass and prevent threatened waste or injury to property. The acts of the Refining Company in disconnecting appellee's lines and appropriating its gas is a continuous trespass which equity will prohibit by injunction in proper cases, even where the covenant does not run with the land, and in all cases where the covenant is real and runs with the land. Wood v. Lowrance, 49 Tex. Civ. App. 542, 109 S. W. 418; Schaeffer v. First National Bank (Tex. Civ. App.) 189 S. W. 556; Hoskins v. Cauble (Tex. Civ. App.) 198 S. W. 629; Houston Oil Co. v. Village Mills Co., 109 Tex. 168, 202 S. W. 725, 226 S. W. 1075; Mitchell v. Burnett, 57 Tex. Civ. App. 124, 122 S. W. 937; Chancey v. Allison, 48 Tex. Civ. App. 441, 107 S. W. 605; G. C. & S. F. Ry. Co. v. Puckett (Tex. Civ. App.) 82 S. W. 662.

When a vacuum is "substantially equal" to another is a question of fact which the trial court has decided. There is nothing in the record which would justify us in setting such finding aside.

If the Tidal Company has failed to make the tests required by the contract, such breach was waived by the acquiescence of appellants' grantors.

In virtue of the contract the Tidal Company acquired all the casinghead gas which the lease would produce. Osgood acquired the entire interest in the lease. The IXL Company, as the operator of the same, had the authority to contract the sale of all gas, and this is in accord with the practical construction which has been made of the contract by the several owners of the lease. Neither Williamson nor any one claiming under him, until the time appellant acquired the property, has ever challenged this construction, and the appellant is bound by it.

The division order was not intended to change or in any way affect the terms of the original contract, and cannot, without doing violence to the contention of the parties, be given such construction. It relates only to a division of the proceeds of the sale of the gas "until further notice," and does not affect the question of title to the gas itself.

We find no reversible error, and the judgment is affirmed.