## SOUTHWEST PIPE LINE CO. v. EMPIRE NATURAL GAS CO.

Circuit Court of Appeals, Eighth Circuit.
May 6, 1929.

No. 8284.

John B. Meserve, of Tulsa, Okl., for appellant.

J. W. Finley, of Chanute, Kan., Hayes McCoy, of Bartlesville, Okl., R. E. Cullison, of Iola, Kan., and Warren T. Spies, of Bartlesville, Okl., for appellee.

Before KENYON, Circuit Judge, and FARIS and SANBORN, District Judges.

KENYON, Circuit Judge. This is an appeal from a decree of the United States District Court for the Northern District of Oklahoma enjoining appellant from interfering with certain rights of appellee to secure the natural gas on real estate hereinafter described. Appellee and the Revelle Oil Company in 1923 entered into a contract of the standard form of gas purchase contracts in Oklahoma, by the terms of which it purchased at the mouth of the wells upon a certain leasehold (the west one-half of the southeast quarter of section 19, township 17 north, range 9 east) owned by said oil company all the merchantable gas in its natural state as produced from wells then ex-

isting upon the leasehold or thereafter to be drilled. Appellee had an extensive pipe line system, and established markets for the delivery and consumption of natural gas. In 1923 appellee constructed a pipe line 13 miles long to the fields where this leasehold was situated, connecting with its main line, at a cost of $125,000. In 1926 it spent on account of a decline in initial pressure an additional $35,000 to construct a compressor station to assist in marketing the gas. The land upon which the Revelle Company had an oil and gas lease was in part the homestead allotment, and in part the surplus allotment, of Albert Big Mosquito, a fullblood Creek Indian, who in 1912 executed an oil and gas lease on the land in favor of one Shirley, which was duly approved by the Secretary of the Interior. A series of properly approved assignments brought said lease to the Revelle Oil Company as its property. Appellee went upon the leasehold, constructed its pipe lines thereon, connecting the three wells on the property with the branch to its main line, and installed structures necessary for the exercise of the rights granted to it by the contract.

May 4, 1926, the Revelle Oil Company executed to the Bu-Vi-Bar Petroleum Corporation assignments covering the leasehold, and the Bu-Vi-Bar Corporation executed assignments to appellant, all of which were duly approved by the Secretary of the Interior. The Department of the Interior had relinquished its supervision over the southeast quarter of the southeast quarter of section 19, township 17, range 9, as a proper alienation thereof had been made by the allottee. As to the other 40 acres of the land involved, departmental supervision was retained. The gas contract involved in this case was not approved by the Secretary of the Interior.

After the assignment by the Revelle Company to the Bu-Vi-Bar Corporation, appellee accounted to said corporation for the gas received from the lease, and the marketing of the gas proceeded until the lease was sold by the Bu-Vi-Bar Corporation to appellant, who, in January, 1927, disconnected appellee's lines from the wells without any notice to appellee, and proceeded to take the gas.

Appellee by its bill sought relief in equity to prevent appellant from interfering with its obtaining the natural gas from the leasehold, and it asked that appellant be required to make specific performance of the contract entered into between appellee and the Revelle Company.

The trial court decreed that appellant and its assigns be enjoined from piping or removing the natural gas from the leasehold in question or from interfering with the possession of the Empire Natural Gas Company and its successor for the purpose of obtaining the production of natural gas from the leasehold, and that appellant be required to perform the terms of the gas purchase contract executed by the Revelle Oil Company and the Empire Natural Gas Company in 1923.

A number of questions are here presented. The first contention of appellant is that the bill of appellee should have been dismissed for want of equity, for the reasons (a) that the contract sued on is lacking in mutuality; (b) that the contract, if valid, creates no interest in real estate of any sort, but is simply an executory contract for the sale of personal property when produced, and that there is no proof that appellant assumed the obligation of the contract between the Revelle Company and appellee, or that appellee has accepted appellant in lieu of the original obligor, and that appellee is not entitled in equity to enforce against appellant the contract which was made by appellee with the Revelle Company. These in their order.

This court has had occasion in many cases to discuss the question of mutuality in contracts for the future delivery of personal property. It is well established that such contract cannot be enforced, if the will, wish, or want of one of the parties determines absolutely the quantity to be delivered. If that situation exists, there is want of mutuality. Cold Blast Transp. Co. v. Kansas City Bolt & Nut Co. (C. C. A.) 114 F. 77, 57 L. R. A. 696; A. Santaella & Co. v. Otto F. Lange Co. (C. C. A.) 155 F. 719; Hutchinson Gas & Fuel Co. v. Wichita Natural Gas Co. (C. C. A.) 267 F. 35; Midland Steel Sales Co. v. Waterloo Gasoline Engine Co. (C. C. A.) 9 F.(2d) 254. If the quantity, however, is "ascertainable otherwise with reasonable certainty," the contract can be sustained. Cold Blast Transp Co. v. Kansas City Bolt & Nut Co., supra; Hutchinson Gas & Fuel Co. v. Wichita Natural Gas Co., supra. "The contract is to be construed as a whole," and, if it is possible to give it an interpretation such as to make it mutual instead of unilateral, it will be done. 13 Corpus Juris, pp. 333 and 539.

With these general rules in mind, we turn to the contract in question. It provides as follows:

"The undersigned vendors, in consideration of One Dollar ($1.00) in hand paid, re-

ceipt acknowledged, hereby sell and agree to sell and deliver at the mouth of the wells to Empire Natural Gas Company, vendee, and the vendee agrees to receive in the usual conduct of its business ratably with other producers in the same field having gas in the same producing horizon or sand, and in accordance with approved practice in the industry, all the merchantable gas in its natural state as produced (except casing-head gas) from wells now drilled and hereafter to be drilled on the following described premises, situated in Creek County, Oklahoma, to-wit:

\*     \*     \*     \*     \*

"Vendee shall not be required to take gas when same cannot be delivered in commercial quantities and at sufficient pressure to enter its lines against the varied working pressure therein, nor connect with unprofitable wells, nor continue connection with such wells after same become unprofitable to it."

It is urged by appellant that, notwithstanding the provision that appellee is to take all the merchantable gas in its natural state as produced, the limitations thereon strip the contract of mutuality, and leave it a naked agreement on the part of the appellee to take only so much of the gas as it wishes to and what it may not happen to obtain from other sources; that the amount the vendee is to take cannot be measured or ascertained by any standard; that there is no promise to take the gas to the extent of appellee's business demands, nor any promise that the vendor shall be the exclusive source of the vendee's supply; that the agreement is in fact to take such gas, as vendee's business needs, which is not supplied from other sources. The uncertainties of the contract arise by virtue of the limitations upon and exceptions to the agreement to take all "the merchantable gas in its natural state as produced." The limiting phrases are "in the usual conduct of its business," "ratably with other producers in the same field," "in accordance with approved practices in the industry." Further, that vendee shall not be required to take gas when same cannot be delivered in "commercial quantities," nor "at sufficient pressure to enter its lines," etc. The term "commercial quantities" is, of course, a well-understood term in the oil industry, and is commonly used in contracts of this nature. Some of these provisions, such as those relating to sufficient pressure for gas to enter its lines, and not being compelled to connect with unprofitable wells, nor continue connections after a well becomes unprofitable, certainly

bear little, if at all, on the question of mutuality. They are usual and necessary precautions incident to the taking and delivery of natural gas by pipe lines.

A contract need not contain definitely and specifically every fact in detail to which the parties may be agreeing. If the phrases used can be made certain by proof, that is sufficient.

The testimony shows that in the business of conveying natural gas by pipe line companies it is not good business or usual to take the full amount of gas a well produces; that 10 per cent. is the fair amount to be taken from each well. This gives a longer life to the well than to take 25 per cent. which is the amount the Corporation Commission of Oklahoma, according to the testimony of witness Long, restricts the operator to. The conservation officers in the Osage Nation restrict producers to 20 per cent. It is apparent there is difference of opinion as to the proper standards of conduct in carrying on pipe line systems for the distribution of natural gas. This court said in Brewster v. Lanyon Zinc Co., 140 F. 801, 814: "The object of the operations being to obtain a benefit or profit for both lessor and lessee, it seems obvious, in the absence of some stipulation to that effect, that neither is made the arbiter of the extent to which or the diligence with which the operations shall proceed, and that both are bound by the standard of what is reasonable."

What is required by this contract is to be determined by the standard of what is reasonable. There is an absence of detail in the contract. It could well be more specific, but it is couched in language appropriate to the approved practices of the established pipe line business, and well understood by those engaged in the oil and gas industry. The phrase "in the usual conduct of its business" can be interpreted in the light of evidence as to what that conduct was. There is, of course, variation in the production of gas wells; the exact amount to be produced on a given day could not be known in advance, nor could the total output of a future day, but the total requirements of a business could be shown; likewise the open flow of the wells and the percentage of flow permissible to be taken in accordance with the approved practices in the business. The phrase "ratably with other producers in the same field" is merely an expression of what is required by the Oklahoma law. Section 7907, Okl. Comp. Stat. 1921. It is true the vendee under the contract did not agree to take all of its gas supply from the vendor. It

agreed to take "ratably with other producers in the same field." This was all it could do under the Oklahoma law, and the contract should not be held void for having therein a provision to carry out the policy of the state as expressed in legislative enactment. We do not think the contract is open to the objection that it is simply a promise that, if appellee desires to take gas, it will take ratably with other producers in the same sand. It is an agreement to take all the merchantable gas in conformity with well-established and approved practices in the industry, one of which, at least, is required by law, and in the usual conduct of an established business, which conduct is susceptible of proof. The quantity of gas to be taken is not entirely at the will or wish of appellee. The contract is not void for want of mutuality.

We pass to the second proposition urged by appellant on the question of want of equity in the bill, viz., that the contract is not enforceable against it, because it is a purely executory one for the sale of personal property when produced, and appellant has not assumed its obligations. The trial court held that the gas contract granted to the vendee an interest in the realty under the laws of Oklahoma, saying: "It is clear the contract granted to the vendee such an easement in the leasehold estate as to bring it within the statutory definition of realty, and is binding upon the assignee of the leasehold estate chargeable with notice of its existence on the date of its purchase." It will be unnecessary to enter into the labyrinth of decision in Oklahoma as to the interest in the real estate of the owner of an oil and gas lease thereon, and of those contracting with him. In Ewert v. Robinson, 289 F. 740, we took occasion to review in part the Oklahoma cases on this subject. It is settled by the decisions of the Oklahoma courts that oil and gas in place are not the subject of ownership distinct and separate from the soil, and that a grant by lease of oil and gas is a grant of such part thereof as the lessee finds and reduces to possession; that an oil and gas lease such as was granted to the Revelle Company with the right of entering thereon and prospecting for oil and gas is more than a mere license, and grants a present interest in the land. Kolachny v. Galbreath, 26 Okl. 772, 110 P. 902, 38 L. R. A. (N. S.) 451; Rich v. Doneghey, 71 Okl. 204, 177 P. 86, 3 A. L. R. 352; Nicholson Corporation v. Ferguson, 114 Okl. 10, 243 P. 195; Morgan v. McGee, 117 Okl. 212, 245 P. 888.

It will be sufficient here to say that no title to the gas passed to the Revelle Company until it had been reduced to possession, and, of course, no title to the gas could pass to appellee under its contract until the same was produced, and, when so produced and at the mouth of the well delivered to appellee, it was personal property. That far, it is true, the contract was simply an executory one for the sale of personal property, but the contract did not stop there. It provided that vendee was to have an easement for installing and maintaining the meter and necessary equipment on the leasehold interest to handle the gas. The contract expressly created an easement, and a right pertaining to the land itself, but outside of the contract we are satisfied the Code of Oklahoma 1921, § 8429, made that right created by the contract to go upon the premises and take the gas an easement. Appellee therefore had an easement in this leasehold, and also what has been termed in the books and decisions a profit à prendre; that is, a right in the nature of an easement appurtenant to an estate to enter upon land of another for various purposes, which would embrace taking natural gas therefrom. It is not of much importance whether this right be termed an easement or a right of profit à prendre in the nature of an easement. The contract gave the right to appellee to go upon the land and place there the necessary structures to connect the wells of the Revelle Company with its system of pipe lines. This gave to appellee some interest in the leasehold binding on the assignee thereof with notice. 14 Cyc. 1142; Graham v. Omar Gasoline Co. (Tex. Civ. App.) 253 S. W. 896; American Refining Co. v. Tidal Western Oil Corporation (Tex. Civ. App.) 264 S. W. 335.

To sustain its theory that the contract is purely one for the sale of personal property and that the appellant, not being a party to the contract, is not bound thereby, much reliance is placed upon the decision of Judge Pollock in Mound Val. Vit. Brick Co. v. Mound Val. Nat. Gas & O. Co. (C. C.) 258 F. 936. In construing the contract there involved, which bears some similarity to the one here, the court held that by its terms personal property in indefinite amounts was sold; that the contract was executory; that the title to the gas passed only as delivery was made; that there was no privity of estate between the assignee of the executory contract and the plaintiff; that there had been no novation of the contract releasing the assignor from liability; and that the covenants in the contract were purely personal, and

said, "Assignees are not bound at law, although they may be named, but in certain instances they may be charged in equity." It must be borne in mind that the action there being discussed by the able District Judge was one at law for damages. There was no question of equitable rights involved, and the court with great care excepts equitable situations from the general rule laid down. The present case is dealing with equities, not rights at law, and we are not concerned with the question as to whether appellee could have sued appellant at law.

■ While we are satisfied that the contract in question did create some interest in the leasehold in the nature at least of a right of profit à prendre, we do not deem it of importance as to whether such right would run with the land and the leasehold, because certain equitable rights were undoubtedly created by the contract which were enforceable according to the expressed intention of the parties against the assignee of the leasehold estate, if that assignee had notice of said rights. On this subject Pomeroy's Equity Jurisprudence (2d Ed.) § 689, p. 959, says:

"On the same principle, if the owner of land enters into a covenant concerning the land, concerning its use, subjecting it to easements or personal servitudes, and the like, and the land is afterwards conveyed or sold to one who has notice of the covenant, the grantee or purchaser will take the premises bound by the covenant, and will be compelled in equity either to specifically execute it, or will be restrained from violating it; and it makes no difference whatever, with respect to this liability in equity, whether the covenant is or is not one which in law 'runs with the land.'"

From section 1295 of the same work:

"It makes no difference whatever, with respect to this equitable liability, and this right to enforce the covenant in equity, whether the covenant is or is not one which in law 'runs with the land.' Subsequent owners deriving title under deeds containing such covenants would, of course, have constructive notice thereof. This equitable right would arise where no similar legal right, or perhaps no legal right at all, would exist between the same parties, in the following instances: 1. Where the covenant is not one which runs with the land, because in such case no legal liability whatever would rest upon the subsequent grantee or owner; 2. Where the covenantee having parted with all interest in the premises, there is no legal privity of estate or of contract between the plaintiff who seeks to enforce the covenant and the subsequent owner against whom the enforcement is sought, because in such case no action at law for a breach would lie; 3. Where the stipulations of the covenant and the breach thereof are of such a nature that there is no basis upon which to estimate damages. In all these cases, however, the covenant may be enforced in equity."

In Whitney v. Union Railway Co., 11 Gray (Mass.) 359, 71 Am. Dec. 715, the court said: "The precise form or nature of the covenant or agreement is quite immaterial. It is not essential that it should run with the land. A personal covenant or agreement will be held valid and binding in equity on a purchaser taking the estate with notice. It is not binding on him merely because he stands as an assignee of the party who made the agreement, but because he has taken the estate with notice of a valid agreement concerning it, which he cannot equitably refuse to perform." From Simms v. Southern Pipe Line Co. et al. (Tex. Civ. App.) 195 S. W. 283: "Where one purchases an oil lease with knowledge that his vendor has contracted that the oil produced on the property shall be sold and delivered to a pipe line company at a price named in the sale contract, he is bound by such contract." In Graham v. Omar Gasoline Co., supra, it was held that the purchaser of the oil and gas lease, with full notice of vendor's contract to sell all the gas produced from oil wells on the land to another, and permit the latter to erect, operate, and maintain all materials, equipment, and structures necessary for performance, was bound by the vendor's covenant.

■ The principle is well established that "a party taking with notice of an equity takes subject to that equity."

"The third, and in its practical effects by far the most important, rule is, that a party taking with notice of an equity takes subject to that equity. The full meaning of this most just rule is, that the purchaser of an estate or interest, legal or equitable even for a valuable consideration, with notice of any existing equitable estate, interest, claim, or right, in or to the same subject-matter, held by a third person, is liable in equity to the same extent and in the same manner as the person from whom he made the purchase; his conscience is equally bound with that of his vendor, and he acquires only what his vendor can honestly transfer. * * * A purchaser with notice of a prior contract to sell or to lease takes subject to such contract, and is bound in the same manner as his vendor to carry it into execution." Pomeroy's Equity Jurisprudence (2d Ed.) pp. 958, 959, § 688; People's

Natural Gas Co. v. American Natural Gas Co., 233 Pa. 569, 82 A. 935; Bryan v. Grosse et al., 155 Cal. 132, 99 P. 499; 7 R. C. L. p. 1125.

If appellant had notice either actual or constructive that the gas contract existed and was in force, and that appellee had certain rights thereby in the leasehold, it would be bound in equity to recognize and respect those rights, and not interfere therewith. That is merely common honesty. Whatever legal pathway is here followed, it leads inevitably to the one determinative and crucial question in this case; namely, whether appellant purchased said leasehold with notice of appellee's rights under the gas contract. The trial court said on this subject:

"It is apparent from the evidence in this case that if the defendant in fact had no actual knowledge of the existence of the contract, that there did exist sufficient visible material objects in the way of pipe lines connected with the wells and compressor stations located on the premises which would reasonably suggest the existence of the easement of the plaintiff. The evidence and circumstances under which the defendant purchased the leasehold estate would indicate that the defendant had actual knowledge of the existence of the contract for the purchase of the gas.
*  *  *
"It seems reasonable that the defendant purchased the leasehold estate with notice of the existence of the contract for the sale of the gas. There was located on the premises a meterhouse, pipe lines, heaters, pinch gates, gas regulators, and meters. The gas from the wells flowed through the meter and was read once a day by an employee of the plaintiff. It is a matter of common knowledge that purchasers of oil and gas properties invariably ascertain the amount of production on procuring properties, and one of the most satisfactory means of obtaining this information is to ascertain what the sales are and to whom the sales are made."

It evidently was of the opinion that the evidence and circumstances under which appellant purchased the leasehold estate indicated that it had knowledge of the existence of the gas contract, and further that, if there was no actual knowledge of appellee's easement, there was constructive notice thereof. The contract was not recorded, so there is no notice from the record. In Shulthis v. McDougal et al., 170 F. 529, this court held that the question of notice turned upon whether the preponderance of the evidence showed that the parties knew, or could by the exercise of reasonable care have ascertained, by whom certain outstanding rights were held. The test laid down is slightly different in Reed v. Munn, 148 F. 737, where this court held that, as applied to the facts of that case, a court of equity would not impute to a purchaser for a valuable consideration notice of an outstanding equity, "unless the circumstances are such as to warrant the court in saying, not only that he might have acquired, but also that he ought to have acquired, it but for his gross negligence in the conduct of the business in question;" that "it is not sufficient that he had the means of obtaining, and might with prudent caution have acquired, the knowledge, but whether the fact of not obtaining it was culpable negligence."

See, also, United States v. Detroit Timber & Lumber Co. (C. C. A.) 131 F. 668.

The Oklahoma rule is laid down in Brooks v. Reynolds et al., 37 Okl. 767, 132 P. 1091, as follows: "Where a person has knowledge of circumstances such as would put a prudent person, acting in good faith, upon inquiry, he is chargeable with actual notice of the facts the inquiry would have disclosed." Syllabus. See, also, Wapa Oil & Development Co. v. McBride, 89 Okl. 184, 201 P. 984, where the rule is stated in concise form in the syllabus by the court as follows: "Whatever is 'notice' enough to excite attention and put a reasonably prudent person on his guard and calls for inquiry is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant with it." In Bernard v. Benson, 58 Wash. 191, 196, 108 P. 439, 441 (137 Am. St. Rep. 1051) the court pointed out that "what makes inquiry a duty is such a visible state of things as is inconsistent with a perfect right in him who proposes to sell." The federal rule of gross negligence in failing to ascertain the facts as a basis for charging constructive notice is stronger than the state rule in Oklahoma. The practical results here are substantially the same, whichever rule be applied.

Among outstanding facts to put a party on notice of another's rights in a leasehold are visible material objects "which may reasonably suggest the existence of some easement or other similar right." Pomeroy's Equity Jurisprudence, § 600. In section 611 of the same work the author states: "If a purchaser sees or has knowledge of, or by the ordinary use of his senses might see or know of, visible material objects or structures upon or connected with the land or other subject matter concerning which he is dealing, he may, and generally will, be charged with

a constructive notice of any easement or other similar right the existence of which would be reasonably suggested to him by the appearance of such material object. He is put upon an inquiry, and is presumed to have ascertained whatever he might have learned by prosecuting the inquiry in a due and reasonable manner." Larsen v. Peterson, 53 N. J. Eq. 88, 30 A. 1094, is an interesting case on this subject. The court there held that, where there was a water pipe leading from a well in a yard to a sink in the kitchen of a dwelling, there ending in a pump, the well and the water pipe being completely hidden from view, that these formed an apparent and continuous easement, and, if the grantee of the yard and well had notice of the existence of the connection between the well and the pump, he was held to notice that the same was an easement, and the court held there was sufficient appearing to put the parties on inquiry. In Wapa Oil & Development Co. v. McBride (Okl.) supra, the court said: "McBride had actual notice that the lease had been executed upon the premises, that the tank had just been built, indicating possession of the plaintiff, and the equipment was still in the old well, with all of these facts, his duty was to inquire of the lessee the right and extent of the title claimed by him."

We turn to the evidence as to the circumstances under which appellant purchased the leasehold interest. It is without question that upon the premises at that time there were pipe lines, heaters, pinch gates, gas regulators, meters, and a meter house or houses, placed there by appellee in carrying out the terms of the contract, and that indicating that rights therein existed in favor of some one. The meter house was a structure 8 by 10, and 7 feet high, set over a 6-inch pipe, which projected 30 inches above the ground for a distance of 40 feet. There were a door and windows in the meter house. The measuring devices therein were equipped with clock work, the tick of which could be heard through the walls. There were connections on each well, and the gas was flowing from the wells through the meter. The meter was read once a day by an employee of appellee. Mr. Ball, associated with the Freeborn Engineering Company, upon whose report in part Mr. Pratt relied, stated in his testimony that there were two meter houses on the premises which bore evidence that they were Empire meter houses; they were not the meter houses of the Bu-Vi-Bar Corporation, because their meter houses were open and could be examined, while the Empire meter houses were locked. There is evidence also that the Empire meter houses were different in construction and in painting from the Bu-Vi-Bar meter houses. The trial court seems to have considered the case on the theory of one meter house on the leasehold belonging to appellee. If there were more than one, it would strengthen appellee's case.

The testimony of Mr. Herndon, who was formerly in charge of the property, employed by the Bu-Vi-Bar Corporation, is interesting. He helped to make the sale; took the representatives of appellant through the field; knew appellee was taking the gas; that it was customary for purchasers to inquire as to who was taking the gas; that they did not inquire in this case; that he did not tell them; that the fact that the Empire was taking the gas from the lease was not discussed at all. This witness, when asked the question whether it was known in the community that the Empire had a line in there and was taking the gas, answered, "Yes, sir, everybody in the country." The trial court felt impelled to question this witness very closely.

Mr. Pratt, president of the Southwest Pipe Line Company, testified that he relied on a geological expert (who was not produced as a witness) and also upon a report from the Freeborn Engineering Company; that he knew nothing about the Empire Company receiving the gas until after the purchase, though he had been out on the property. He ascertained it from an employé after the purchase. Mr. Pratt bought some 40 leases from Mr. Buell in the same transaction, and paid therefor some $625,000. The trial court, evidently becoming interested in a situation where the president of a pipe line company claimed to purchase a lease, knowing little about the gas production thereof, asked him as to his talking about it with Mr. Buell, president of the Bu-Vi-Bar Corporation. Mr. Pratt said that he did, and that Mr. Buell told him the Empire Company was taking gas, but that they could be disconnected at any time. This was after the transaction had been consummated, and he gathered in talking with Mr. Buell that there was a gas purchase contract on the wells. Mr. Buell told him he would protect him. Further, Mr. Pratt testified he bought the leasehold to assist in getting a supply of gas for the municipalities where his company was distributing the same. He bought the leases only to get the gas. These wells were not connected with his lines. Mr. Buell testified that he sold the lease to Mr. Pratt's Company, and that he had prior to that time not informed Pratt that there was a contract out on this lease to the Empire Company. His testi-

mony is very evasive and unsatisfactory. We quote therefrom the following:.

"Q. Did you make any affirmative statements to Mr. Pratt that there were no contracts covering this Revelle Company lease? A. No, sir.

"Q. You simply failed to discuss it? A. It just did not come up.

"Q. Did you tell him you were marketing the gas from the Revelle Company lease to the Empire? A. There wasn't any individual lease ever discussed, to my knowledge.

"Q. Did you ever tell him that you were marketing all the production or attached to all the producing wells on this block that you were selling to him? A. I don't think so, no.

"Q. That did not occur to you as being an important communication in reference to this trade? A. It was a question of how much the property was making. See?"

The testimony shows that it was customary in the oil fields to make contracts with some gas company by owners of gas leases. Witness Long testified there were not 10 per cent. of the gas leases in Oklahoma which were not under contract to some gas company; that these contracts were usually for the life of the lease; that such was the universal and wide-spread custom in Oklahoma. This witness also testified that, if you came on a lease which had a meter house on it, wells connected up, the ordinary fittings usual in marketing gas, it would be notice that some party was taking the gas, and there would naturally be an investigation to know to whom it belonged; that, if it was discovered that gas was being marketed from the lease, the right of the purchaser to take the gas would be investigated; that this was a most ordinary precaution in the industry.

Under all these circumstances, especially the known fact that a party would not invest the large sum of money that appellant was investing without knowing fully as to production of gas upon the leasehold and its distribution, a portion of the testimony of Herndon, Pratt, and Buell is somewhat of a challenge to credulity. Evidently the court thought the officers of appellant must have known of the existence of the contract for the purchase of the gas. If they did not know, the court concluded that with the meter house, pipe lines, and other visible appurtenances on the premises indicating that gas was being taken therefrom, they were put on inquiry, and should have investigated as to the rights of the owners of these appurtenances, and, having been put on notice, were bound by what an inquiry would have shown to be the facts. Everyone in the community, according

to one of appellant's witnesses, knew that the Empire Company was taking gas from these premises, and, while a person is not held to inquiry or notice by mere suspicion, guess, or inference, this testimony, in connection with other circumstances, is important as showing a very general knowledge of the situation.

Appellant was engaged in the business of transporting natural gas by pipe lines; its officers had knowledge of the method in which the business was carried on, and that pipe lines were constructed under contracts covering long periods of time, and it is difficult to believe that appellant's officers, skilled in this business, would make no investigation as to who was taking the gas, and the nature of the contracts under which they were operating, and that the matter "just did not come up." If they did make any investigation, they must have discovered appellee's rights; if, under the circumstances here shown, of visible and outstanding objects upon the leasehold, strongly suggesting rights in other parties, they made none, they were guilty of such negligence as to preclude their asserting a want of notice as to such rights. Section 607, Pomeroy's Equity Jurisprudence (2d Ed.), seems to so fit this situation that we quote it:

"Same—Rebutted by Due Inquiry—It may be stated as a general proposition that in all instances of constructive notice belonging to this class, where it arises from information of some extraneous facts, not of themselves tending to show an actual notice of the conflicting right, but sufficient to put a prudent man upon an inquiry, the constructive notice is not absolute; the legal presumption arising under the circumstances is only prima facie; it may be overcome by evidence, and the resulting notice may thereby be destroyed. Whenever, therefore, a party has merely received information, or has knowledge of such facts sufficient to put him on an inquiry, and this constitutes the sole foundation for inferring a constructive notice, he is allowed to rebut the prima facie presumption thence arising by evidence; and if he shows by convincing evidence that he did make the inquiry, and did prosecute it with all the care and diligence required of a reasonably prudent man, and that he failed to discover the existence of, or to obtain knowledge of, any conflicting claim, interest, or right, then the presumption of knowledge which had arisen against him will be completely overcome; the information of facts and circumstances which he had received will not amount to a constructive notice. What will amount to a due inquiry must largely depend upon the

circumstances of each case. If, on the other hand, he fail to make any inquiry, or to prosecute one with due diligence to the end, the presumption remains operative, and the conclusion of a notice is absolute. The criterion thus laid down will serve to determine the prima facie nature of the presumption in a very large number of the instances which are properly referable to the class of 'constructive notice.'"

It may be noted that upon examination of the abstract by the attorneys for appellant one of the requirements set forth by them was as follows: "Satisfactory proof that oil or gas was produced in paying quantities under this lease, prior to March 29, 1913, and that the same has been continually produced in paying quantities since that date." It would be difficult to satisfy such requirement without ascertaining that the appellee was taking and marketing the gas.

The leading cases cited by appellant, Reed v. Munn (C. C. A.) 148 F. 737 and United States v. Detroit Timber & Lumber Co. (C. C. A.) 131 F. 668, did not arise under conditions where there were visible structures on the property as there are here to challenge attention of the parties and put them on inquiry.

It is the contention of appellant that the Bu-Vi-Bar Corporation was in possession of the leasehold to a more obvious extent than was appellee, and that an investigation of the record would have shown that the Bu-Vi-Bar Corporation had an unincumbered title to the lease, with the exception of a certain right of way owned by appellee for one pipe line, and that under such circumstances whatever possession appellee had, as evidenced by the meter house, could rightfully be ascribed to the exercise of its rights under its right of way contract, and therefore would be no constructive notice of the gas purchase contract, and cites Simonson v. Monson, 36 S. D. 245, 153 N. W. 1020, to that effect. It is true that the kind of possession sufficient to put one interested on inquiry, and to charge him with notice of the rights of parties which do not appear of record, "must be such as to be inconsistent with the title upon which the subsequent purchaser or incumbrancer relies." 2 Devlin on Real Estate, p. 1408.

If appellant had knowledge of the meter house, and, upon investigation of the title to the leasehold, had discovered that appellee had a right of way for a pipe line across the premises, a court might have found that the meter house gave no notice of any right inconsistent with the title upon which the gran-

tee of the leasehold relied. Even then the question of whether or not the meter house or houses of appellee upon the leasehold could reasonably be assigned to a recorded right of way across the premises to appellee would be a question of fact for the court, under all the circumstances, to determine, and which of necessity would enter into its conclusion. While it is true that the person examining this property might be deceived as to the relationship of the meter house to the pipe line across the property under a recorded right of way contract, there is no evidence here to show that any one was so deceived. No witness so claimed. The evidence of appellant's witnesses is that, outside of the abstract examined by appellant's attorneys, no investigation whatsoever was made of the situation, and the parties representing appellant in purchasing the leasehold knew nothing about the meter house and other appliances on the leasehold. The evidence is somewhat confusing as to whether or not appellee had more than one meter house on the premises at the time of its acquisition by appellant. Certainly, if there were two meter houses of appellee, both could hardly be ascribed to the right of way theretofore granted appellee. It would seem that, where a lease had upon it several meter houses, when it normally would have only one, there would be a more urgent duty of inquiry. While the legal proposition contended for may be sound, it is not applicable to the situation presented.

We regard the question of notice as a very close and doubtful one in this case. If the trial court had found that the appellant had purchased without any notice either actual or constructive, we should not have interfered with its conclusion. The finding of the trial court sitting as a chancellor is entitled to great respect and very persuasive force in an appellate court, and this court has in many cases declared that, "where a court has considered conflicting evidence, and made a finding or decree, it is presumptively correct, and unless some obvious error of law has intervened, or some serious mistake of fact has been made, the finding or decree must be permitted to stand." Silver King Coalition Mines Co. v. Silver King C. M. Co. (C. C. A.) 204 F. 166. See, also, Harper v. Taylor (C. C. A.) 193 F. 944; Harjo v. Empire Gas & Fuel Co. (C. C. A.) 28 F.(2d) 596; United Shoe Machinery Corporation v. United States, 258 U. S. 451, 42 S. Ct. 363, 66 L. Ed. 708. There was substantial evidence, and strong inferences therefrom, to support the holding of the trial court that appellant had both actual and constructive notice of the

258

rights of appellee. Therefor we do not disturb that conclusion.

Appellant contends that, even if it had notice of appellee's rights, specific performance of the contract should not be granted, because it is shown by the evidence that appellee could obtain an available supply of gas from other sources. There was evidence that in the gas field in and around Bristow one Wilson had brought in a well that gauged some 37,600,000 feet per day, and that he offered to sell the gas to the Empire Company at the same price as was being paid under the contract in question, but that the company refused to accept the offer. In Texas Co. v. Central Fuel Oil Co. (C. C. A.) 194 F. 1, 13, it was contended that specific performance was not the proper remedy to enforce a contract affecting personal property, and that a court of equity is without jurisdiction when an action for damages is adequate. The court said: "It is now well settled that, when the chattels are such that they are not obtainable in the market, or can only be obtained at great expense and inconvenience, and the failure to obtain 'them causes a loss which could not be adequately compensated in an action at law, a court of equity will decree specific performance." In Hall v. Philadelphia Co., 72 W. Va. 573, 78 S. E. 755, the court said: "Contracts of sale of mere commodities procurable in the markets are never subjects of specific performance for obvious reasons, but this contract is not within that class. Natural gas is not obtainable in the general markets as is wheat, corn, flour and live stock." See, also, Pomeroy's Specific Performance of Contracts (3d Ed.) p. 41, § 15.

Here it is without dispute that, relying in part upon its contract with the Revelle Company, appellee built a pipe line at an expense of $125,000, and a compressor station at an expense of $30,000. The testimony shows that the production from the leasehold in question is about 25 per cent. of the production of the field available to appellee's pipe line. Therefore, by appellant's acts, if successful, appellee would be deprived of one-fourth of the gas which it needs to carry on its established business. In order to secure gas from the adjacent field, it would be necessary to lay other pipe lines and to make new connections. The building of new pipe lines and the installing of new meters is a matter of large expense. It is not the same situation as securing coal or other commodities to take the place of those which may not be supplied under a contract. The whole situation as to natural gas is uncertain, and the obtaining of the gas from other sources could be only at great expense and inconvenience. The contract tendered by the Wilson interests provided for the taking of a minimum supply of gas, which appellee was not willing to do. Under these circumstances, we do not agree with the position taken by counsel for appellant in his most able argument that the remedy must be at law for a breach of contract. We think 'there is no question that this action is maintainable under the general principles of equity on account of the inadequacy of any legal remedy to afford appellee proper relief. The adequate remedy at law must be as practical, speedy, plain, and complete as the remedy in equity. The damages to be recovered by appellee would seem to be speculative and impossible of proof, for it could not be ascertained what the flow of the wells would be or what decrease would come about in the natural order of events. The action of appellant was a trespass upon appellee's rights, assuming that those rights were known to it. Equity could enjoin such interference, and, if the same worked specific performance of a contract to which appellant was not a party, that would be relief incidental to the protection of the rights granted by the contract. On the general subject see White Marble Lime Co. v. Consolidated Lumber Co., 205 Mich. 634, 172 N. W. 603; Dells Paper & Pulp Co. v. Willow River Lumber Co., 170 Wis. 19, 173 N. W. 317; American Refining Co. v. Tidal Western Oil Corporation (Tex. Civ. App.) 264 S. W. 335; Pioneer Sand & Gravel Co. v. Seattle Const. & D. D. Co., 102 Wash. 608, 173 P. 508; 16 Cyc. p. 41.

Another point suggested, to which reference should be made, is that the contract in question was not approved by the Secretary of the Interior; appellant contending, therefore, it was not valid. One-half of the leasehold on which two wells were situated had been released from restrictions, but the remainder thereof had not. This question does not seem to have been presented in the trial court, although it is pleaded in the answer. It is not covered in the assignments of error. A witness from the Indian Agency, Mr. Smith from the Lease Department of the Five Civilized Tribes, testified that the Secretary of the Interior paid no attention to gas purchase contracts; that the lessees were permitted to execute such contracts as they desired. An assignment of the leasehold as to the 40 acres of restricted land, to be valid, would have to be approved by the Secretary of the Interior, but we do not think this contract created an interest which would amount

to an assignment of any part of the leasehold within the prohibition of the law forbidding an assignment without the consent of the Secretary of the Interior. The Revelle Company under its lease approved by the Secretary of the Interior had the right to pipe the gas off the land and sell it—therefore it could sell it to others and permit them to come on the leasehold to obtain it. While this question is not properly before us, we deem it not inappropriate to make these suggestions with reference thereto.

The equities of this cause are with appellee. A court of equity had jurisdiction to prevent appellant interfering with appellee's rights created by its contract with the Revelle Company, and which were known to appellant, or would have been known by proper inquiry suggested by the physical structures upon the leasehold.

The decree and judgment of the trial court is affirmed.