**STANDARD OIL COMPANY OF TEXAS, Appellant,**

v.

**LOPENO GAS COMPANY, Appellee.**

**No. 15947.**

United States Court of Appeals
Fifth Circuit.

Jan. 16, 1957.

J. C. Hutcheson, III, Wiley N. Anderson, Jr., Houston, Tex., for appellant. Baker, Botts, Andrews & Shepherd, Houston, Tex., of counsel.

Thos. R. Hartnett, III, Turner, White, Atwood, McLane & Francis, Harry S. Welch, Dallas, Tex., for appellee.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

RIVES, Circuit Judge.

The district court permanently enjoined Standard from delivering, selling, or in any other way disposing of gas produced from one of its wells except to Lopeno. Lopeno claimed the right to purchase the gas under an agreement entered into on January 31, 1935 between American Texas Oil Co. and Nordan and Morris, a co-partnership, purporting to bind American Texas to sell to Nordan and Morris or their assigns all gas produced from wells drilled or to be drilled on certain described premises. Lopeno had succeeded to the rights of Nordan and Morris under said agreement. Standard's well had been drilled under an assignment of the oil and gas rights below 4000 feet on said premises from the successors in interest of American Texas.

Standard had drilled and completed its well about three years prior to the

filing of the suit, had consistently refused to deliver the gas produced from this well to Lopeno, and was, at the time suit was filed, using it to drill another well.

Standard asserts two principal defenses. The first is that, while the agreement purported to bind the Seller to sell all gas which might be produced from wells located on certain premises, it did not bind the Buyer to purchase any gas and was, therefore, so lacking in mutuality as to be unenforceable.

The second main defense asserted by Standard is that, even if the agreement constituted a binding contract, it was not applicable to the production from the well in question; that the parties were contracting only in relation to production from the shallow sands which had at that time been discovered and developed and that they did not intend to cover or contract with reference to production from deep wells such as that of Standard.

In addition, Standard makes two contentions directed against the remedy of a permanent injunction. First, it says that, if the agreement be held to be a valid contract and be construed to cover production from the well in question, it is so one-sided and unconscionable an agreement as not to be enforceable in equity. Second, it says that, in any event, the district court erred in granting a *permanent* injunction after a hearing on an order to show cause why a *preliminary* injunction should not be issued.

I. Validity of Contract.

The agreement of January 31, 1935 first provided that:

"Seller, in consideration of the sum of One ($1.00) Dollar, and other good, valuable and sufficient considerations, receipt of which is hereby acknowledged, and the covenants and agreements hereinafter set out, hereby sells and agrees to sell and deliver to Buyer, and Buyer agrees to purchase and receive from Seller, in accordance with the provisions

hereof, all of the merchantable gas which may be produced from all gas wells now drilled or which may hereafter be drilled on the hereinafter described premises during the terms of the present leasehold or leaseholds thereon, or any renewals or extensions thereof . * * *."

The agreement then continued,

"Buyers shall not be under any obligation to take all or any specified proportion of the gas that can be produced from the above described premises during any defined or specified time; but Buyer shall endeavor to take gas from the herein described lands and leaseholds in the same equitable or ratable proportion that it takes gas from lands and leaseholds which it now owns or shall hereafter own, and from the lands and leaseholds of others from whom Buyer is now purchasing and/or may hereafter purchase gas in the gas field in which said premises of Seller are located. It is recognized and agreed that varying operating, mechanical and physical conditions governing the producing of natural gas must of necessity regulate the taking of gas from any given or specific well, and this condition will make it impossible for Buyer to take gas from each and every well in exact ratable proportions. Buyer does agree, however, that it will insofar as varying circumstances and conditions will justify and permit, maintain an equitable or ratable withdrawal of gas from seller's lands and leaseholds described herein, as compared with the withdrawals from lands and leaseholds which Buyer now owns or shall hereafter own, and from the lands and leaseholds of others from whom Buyer is now purchasing and/or may hereafter purchase gas in the gas field in which said premises of Seller are located."

Neither party has discussed in brief or argument the effect of the recital of the receipt of a consideration of one

dollar, "and other good, valuable and sufficient considerations," and we shall, therefore, assume that in Texas such recital is merely nominal, and does not preclude the seller from disputing generally the fact of consideration. See McKay v. Tally, Tex.Civ.App., 220 S.W. 167, 170.

Appellant insists that, while the agreement purports to obligate the Seller to deliver all gas which the Buyer may desire to receive up to the capacity of the wells, the Buyer is not obligated to take all the gas the Seller can produce or, indeed, to take any particular proportion or quantity thereof; that, while the agreement purports to obligate the Buyer to take ratably from the Seller's leases in proportion to takings from other leases from which the Buyer either produces or purchases gas in the Lopeno field, it does not require the Buyer to take any specified quantities of gas from the Lopeno field as a whole, or even to take from the field any specified percentage of its total requirements of gas; that the agreement to take ratably thus becomes completely illusory and is insufficient consideration to support the promise of Seller.[1]

Appellee, on its part, points out that the agreement should, if possible, be construed in such a way as to make the obligations imposed by its terms mutually binding upon the parties;[2] that appellant's contention that the Buyer is not required to take *any* gas from the Lopeno field is negatived by the first provision of the agreement obligating the Buyer to purchase and receive *all* of the merchantable gas which *may* be produced from *all* gas wells on the premises; that the provisions for ratable withdrawal of gas from the Seller's lands and leaseholds as compared with the withdrawals from lands and leaseholds of the Buyer or of others from whom the Buyer may purchase gas in the Lopeno field were little more than expressions of what was, in any event, required by Texas statute,[3] and did not destroy the mutuality of the consideration;[4] and, finally, that if there were any doubt as to the mutuality of the obligations of the contract at the time it was made, past performance had rendered the contract valid and enforceable long before Standard's well was completed in 1953.

For its last mentioned contention, appellee relies upon Hutchings v. Slemons, 141 Tex. 448, 174 S.W.2d 487, 489, 148 A.L.R. 1320, in which the Supreme Court of Texas repeated:

" 'Though a contract be void for lack of mutuality at the time it is made, and while it remains wholly executory, yet, when there has been even a part performance by the party seeking to enforce the same, and in such part performance such party has rendered services or incurred expense contemplated by the parties at the time such contract was made, which confers even a remote

---

**1.** In support of its position, the appellant cites the following authorities: Restatement, Contracts, § 79; Cold Blast Transportation Co. v. Kansas City Bolt & Nut Co., 8 Cir., 114 F. 77, 57 L.R.A. 696; Hutchinson Gas & Fuel Co. v. Wichita Natural Gas Co., 8 Cir., 267 F. 35; Southwest Pipe Line Co. v. Empire Natural Gas Co., 8 Cir., 33 F.2d 248; 10 Tex. Jur., 163; W. T. Rawleigh Company v. Land, 115 Tex. 319, 279 S.W. 810; W. T. Rawleigh Co. v. Gober, Tex.Civ.App., 3 S.W.2d 845; El Paso Gas, Electric Light & Power Co. v. City of El Paso, 22 Tex. Civ.App. 309, 54 S.W. 798; Davis v. Phillips A. Ryan Lumber Co., Tex.Civ. App., 248 S.W. 448; Texas Produce Exchange v. Sorrell, Tex.Civ.App., 168 S.W. 74.

**2.** Citing Portland Gasoline Co. v. Superior Marketing Co., 150 Tex. 533, 243 S.W.2d 823, 824; Carpenter Paper Co. v. Calcasieu Paper Co., 5 Cir., 164 F.2d 653, 656; Armstrong v. Southern Production Co., 5 Cir., 182 F.2d 238, 242.

**3.** Article 6049a, Vernon's Ann.Civ. Statutes of Texas. See, however, Texoma Natural Gas Co. v. Railroad Com. of Tex., D.C.W.D.Tex., 59 F.2d 750, as to whether said statute is an unconstitutional burden on interstate commerce.

**4.** Appellee relies heavily upon a case cited also by appellant, Southwest Pipe Line Co. v. Empire Natural Gas Co., 8 Cir., 33 F.2d 248, 251, 252.

benefit on the other party thereto, such benefit will constitute an equitable consideration, and render the entire contract valid and enforceable.' Big Four Ice & Cold Storage Co. v. Williams, Tex.Civ.App., 9 S.W.2d 177, 178, writ refused.

" 'The test of mutuality is to be applied, not as of the time when the promises are made, but as of the time when one or the other is sought to be enforced.' Quoted from Edwards v. Roberts, Tex.Civ.App., 209 S.W. 247, 251; Id., Tex.Civ.App., 212 S.W. 673, writ refused, in the Big Four Ice & Cold Storage Co. case."

Appellee points out that another section of the contract provided that the Buyer was obligated to make connections to all existing wells of the Seller within sixty days from the effective date of the contract, and thereafter to make connection to any additional well within sixty days after the well had been completed and equipped. The pipeline gathering system, owned by Lopeno, had been in operation gathering gas under this agreement and under other contracts since 1937. This system is tied in to all of the wells in the Lopeno field, except Standard's well as to which Standard refused Lopeno permission to make connection. For more than fifteen years before Standard completed its well, Lopeno and its predecessor had been operating the pipeline system, taking and gathering gas ratably from the wells in the Lopeno field. Lopeno needs all of the gas purchased in the Lopeno field to meet its obligations, including the gas which Standard's well is capable of producing.

■ Without further elaboration, we think it very clear that there is no merit to appellant's argument that the agreement lacks the necessary contractual elements of mutuality of obligations and certainty. Indeed, on this score we find ourselves in substantial agreement with each of the appellee's positions as they have been heretofore stated.

II. Construction of the Contract.

Appellant insists that, when the agreement is construed reasonably and in the light of the circumstances existing at the time of its execution, it does not cover production from the well in question. We briefly recount the circumstances relied on. When the agreement was made in 1935, the Lopeno gas field had been only partially developed, production was from the Queen City sands which range in depth from 2200 to 3000 feet. Standard's well was completed in 1953 in a Wilcox sand at a depth of approximately 9100 feet. Further, while Standard's well is located in the general area of the Lopeno field, it is three or four thousand feet to the south of the theretofore productive limits of the Lopeno field. The agreement fixed the price of gas to be delivered thereunder at 3¢ per thousand cubic feet, measured at a pressure base of 4 pounds above atmospheric pressure, and, converted to the standard pressure base now used, the price becomes approximately 2½¢ per thousand as compared to the present market price of gas in the area of slightly more than 12¢ per thousand. Standard's 9100 foot well cost it approximately $250,000.00 to drill and complete. Its engineer estimated that, at a sale price of 2.5¢ per thousand, "the well would not pay out in thirty years." In 1935 operators in Texas did not drill deep wells in search of gas. There was then an abundant oversupply of gas for the available market at prices approximating one-fifth the present market price.

■■ The Texas cases are, however, clear to the effect that, when a contract is so worded that it is not fairly susceptible of more than one legal meaning, it cannot be rendered ambiguous by a consideration of the surrounding circumstances. Remington Rand, Inc., v. Sugarland Industries, 1941, 137 Tex. 409, 153 S.W.2d 477; Murphy v. Dilworth, 1941, 137 Tex. 32, 151 S.W.2d 1004. The language of the present contract binding the Seller to sell and deliver to Buyer "all of the merchantable gas which

may be produced from all gas wells now drilled or which may hereafter be drilled on the hereinafter described premises during the terms of the present leasehold or leaseholds thereon, or any renewals or extensions thereof" seems to us too plain and clear to permit of more than one meaning.[5]

### III. Enforceability in Equity.

■■ It is elementary that a court of equity will not allow itself to become an instrument of injustice, and will not lend itself to the enforcement of a harsh and unconscionable bargain. The fairness of a bargain is to be judged, however, as of the time of its making. As said in 49 Am.Jur., Specific Performance, § 49,

> "Specific performance of a contract fair when made will not necessarily be denied because it has become a hard bargain through subsequent events and changed conditions; and it may be said to be the general rule that the mere fact that the value of property which is the subject of a contract has increased or diminished since the contract was executed will not ordinarily warrant a court in refusing to grant a decree of specific performance, in the absence of circumstances indicating fraud or bad faith."

Certainly, that is the rule prevailing in Texas. Bennett v. Copeland, 149 Tex. 474, 235 S.W.2d 605, 608; Moore v. Kirgan, Tex.Civ.App., 250 S.W.2d 759, 767; 38 Tex.Jur., Specific Performance, § 16, p. 665.

■ There is nothing which indicates to us that any fraud or overreaching entered into the making of the contract, or that in 1935 it was unduly harsh or unconscionable. Presumably in 1950, when Lopeno succeeded to the then desirable position of Buyer under the con-

tract, it paid adequate consideration for its advantage. When Standard drilled its deep well in 1952 and 1953, it did so of its own volition and with full knowledge of all of the facts and circumstances. We see no sound reason to deny to the appellee its remedy by way of injunction, a proper remedy to prevent the continuing breach of the contract. Southwest Pipe Line Co. v. Empire Natural Gas Co., 8 Cir., 33 F.2d 248; Xenia Real Estate Co. v. Macy, 147 Ind. 568, 47 N.E. 147; Peoples Natural Gas Co. v. American Natural Gas Co., 233 Pa. 569, 82 A. 935.

### IV. Authority to Grant Permanent Injunction.

■ The most unusual situation is presented of the grant of a permanent injunction after a hearing on an application for a preliminary injunction. In the Texas State courts, the recent decision in Houston Belt & T. Ry. Co. v. Texas & New Orleans Railroad Co., Tex., 289 S.W.2d 217, would seem to establish that under no circumstances may a Texas trial court grant a declaratory judgment on the merits on a hearing for temporary injunction. That case is not, however, controlling on a question of procedure in the federal courts where the procedure is uniform throughout the Nation, and conforms to the Federal Rules of Civil Procedure, 28 U.S.C.A., when applicable. There is little or no help toward a solution of the definite question here presented in those Rules or more specifically in Rule 65 prescribing the procedure in injunction cases.

■ It goes without saying that *ordinarily* a permanent injunction cannot be granted on the hearing of an application for a temporary injunction. But is that true in this case? There appear to be no material issues of fact. The dispute centers entirely about the validity and construction of a written con-

---

**5.** Appellee's counsel in brief make an apt thrust when they say:
"To follow Standard's reasoning to its logical conclusion, the very lease which Standard acquired by assignment as to deep rights only would not cover those deep rights, because the original parties to that lease, executed so long ago, would not have foreseen that subsequent advancement in the oil industry would enable operators to drill as deeply as Standard drilled its own well!"

**510**

tract. The district court decided those disputed questions of law, and, as we have indicated, it decided them correctly. Nothing more remained to be tried. Under such circumstances, a reversal would be a useless formality.

■ It is settled beyond controversy that if, at the hearing on an application for preliminary injunction, the evidence shows clearly that the plaintiff has not stated a claim upon which relief can be granted and cannot state such a claim, the court should dismiss the plaintiff's complaint. Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 495, 20 S.Ct. 708, 44 L.Ed. 856. That long established practice is akin to the more modern practice of granting a summary judgment when there is no genuine issue as to any material fact. Rule 56, F.R.C.P. When the circumstances warrant, it would seem that a similar prompt procedure should be available against the defendant as is provided against the plaintiff. Only one case has been found directly in point so holding. In Allegheny Oil Co. v. Snyder, Circuit Judge Day (later Associate Justice) speaking for the Sixth Circuit said:

"It is urged by counsel for appellant that the circuit court erred in disposing of the cases on their merits, and entering final decrees therein without taking proof in due course under the equity rules. The cases came on for hearing on the application of the oil company for a temporary injunction, the granting or refusal of which necessarily involved the continuing of the injunction granted in the state court, as well as the cross application of the oil company for an injunction. The court considered these cases together. The cases stood upon bill, answer, and affidavits. In view of the construction given the Snyder lease in the circuit court, affirmed in this court, the holders thereof were entitled to have their rights protected, and interference therewith by holders of the second lease enjoined. The first lease being held valid, the attempted second lease must necessarily fail. There was nothing in the bill of the Allegheny Oil Company in the one case, or its answer in the other, which required further testimony before construction and effect could be given to the first lease. As was said by Judge Thompson in the circuit court, the facts were substantially undisputed. The allegation made that Fowler understood the premises were to be promptly drilled for oil and gas could not affect the agreement as reduced to writing, in the absence of allegations of fraud or mistake. There was no attempt to reform the instrument. No amendment to the bill or answer was proposed, nor has there been any suggestion of further facts material to the controversy. In such cases the courts of the United States may proceed to administer final relief without putting the parties to the expense and delay of protracted litigation. Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 20 S.Ct. 708, 44 L.Ed. 856, citing with approval, Gardt v. Brown, 113 Ill. 475; Green v. Mills, [4 Cir.] 69 F. 852, 16 C.C.A. 516, [30 L.R.A. 90] 25 U.S.App. 383; and the decision of this court in Mayor, etc., of Knoxville v. Africa, 77 F. 501, 23 C.C.A. 252, 47 U.S.App. 74." Allegheny Oil Co. v. Snyder, 106 F. 764, 770–771.

See also Jackson Co. v. Gardiner Inv. Co., 1 Cir., 200 F. 113, 115, 119; Coty v. Prestonettes, Inc., 2 Cir., 285 F. 501, 516, reversed on other grounds, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed 731; 14 Cyc. of Federal Procedure, 3rd ed., § 73.77, p. 801. We find no persuasive authority to the contrary.

■ The issues relating solely to the validity and construction of a written contract and there being no genuine issue of fact, a reversal would serve no good purpose; and we, therefore, hold that the district court did not err in granting the permanent injunction and thus disposing of the case on its merits.

Affirmed.