## ROBERT OIL CORPORATION et al. v. JONES et al. (No. 2332.)

Court of Civil Appeals of Texas. El Paso.
Dec. 12, 1929.

Rehearing Denied Jan. 9, 1930.

De Montel & Sanford and Weeks, Morrow, Francis & Hankerson, all of Wichita Falls, for appellants.

H. R. Wilson, of Fort Worth, Kilgore & Rogers, Carrigan, Britain & King, and E. R. Surles, all of Wichita Falls, and Fred Arnold, of Graham, for appellees.

HIGGINS, J. This is a suit by R. Q. Jones, Geo. Abercrombi, and A. D. Montgomery, as plaintiffs, and T. L. Looney, as intervener, appellees herein, against Robert Oil Corporation, Atlantic Oil Producing Company, Allday Oil Corporation, and C. W. Clark, appellants here, to recover an undivided one-half interest in and to the minerals in a tract of land containing 8.85 acres, a part of fraction B of T. E. & L. Co. survey No. 3401 in Young county.

On October 23, 1919, J. M. Keen was the

owner of a tract of land out of fraction B in said survey 3401, which he called his "hog pasture." J. M. Keen originally acquired the whole of "fraction B" prior to 1900; the deed to him describing "fraction B" as containing 853 acres. After his acquisition thereof, J. M. Keen conveyed two 100-acre tracts out of "fraction B" to third parties no way concerned in this suit. It was the remainder of fraction B that he called his "hog pasture"; and up to the time of his death in 1921 he seems to have considered that there were 710 acres in such pasture.

On October 23, 1919, J. M. Keen conveyed this tract in part to his son J. E. Keen, and in part to his daughter Mrs. C. E. Graham. These deeds were contemporaneous, both were made in consideration of love and affection; the north portion of the tract being conveyed to the son J. E. Keen, and the southern portion to the daughter Mrs. C. E. Graham, The deed to J. E. Keen described the tract conveyed as follows: "250 acres out of Abstract No. 1221, being the Northern end of Hog Pasture now owned by me, Survey No. 3401 located in Young County, Texas, the tract herein conveyed being 250 acres off the north end of said Hog Pasture tract which contains 710 acres in all."

The deed to Mrs. C. E. Graham described the tract conveyed as follows: "All that certain tract or parcel of land located in Young County, Texas, and being the 460 acres off the South end of the Hog Pasture tract now owned by me, which said tract contains in all 710 acres of land, same being out of T E L Co. Survey No. 3401, Abstract 1221, located in Young County, Texas."

On September 3, 1926. J. E. Keen and wife made an oil and gas lease to V. A. Porter and W. C. Chapman, describing the land covered thereby, as follows: "Being the East 200 acres of the North 250 acres out of the 710 acre tract formerly owned by J. M. Keen, said 710 acres being out of the T E L Co. Survey No. 3401, Abstract 1221 located in Young County, Texas, and containing 200 acres more or less."

On November 12, 1926, J. E. Keen and wife made an oil and gas lease to the Robert Oil Corporation, describing the land conveyed as follows: "The West 39 acres of the North 239 acres owned by J. E. Keen out of Fraction B, T E L Co. Survey No. 3401."

Both of these leases passed by mesne conveyance to the defendants below.

J. E. Keen was a resident of Aspermont, in Stonewall county, Tex., and left the matter of negotiating for oil and gas leases on his land in Young county, Tex., to his brother, Charles N. Keen, who resided in Young county; and the negotiations resulting in the two oil and gas leases above mentioned were conducted on his behalf by his brother, upon whom he relied to attend to the matter and "left it up to him."

The 200-acre lease was the consummation

of an agreement between Chapman & Porter and Charles N. Keen on behalf of his brother, whereby Chapman and Porter were to get "200 acres off the East side to drill a well on" and the tract was described as "the East 200 acres of the North 250 acres" because it was supposed by all parties at the time the lease was drawn that there was 250 acres of land in the J. E. Keen tract.

After the execution of this lease, and before the execution of the second lease, some character of survey was made, as a result of which it was discovered that there were not 710 acres in the "hog pasture"; and the surveyor reported to Charles N. Keen "that he thought there was only 239 acres in the part that would go to Eddie, my brother"; i. e., J. E. Keen. Mr. Welch, acting for the Robert Oil Corporation, went to see Charles N. Keen about leasing the balance of his brother's land, and the latter testified: "I told him I would lease him the balance of the land, that is, the balance of my brother's land, and we thought at that time it was surveying out 39 acres that was not already covered with the lease. So we drew it up, the West 39 acres of the North 239 acres. * * * When Welch came to me I agreed to lease him the balance of my brother's land unleased and we figured out at 39 acres. It was my intention in drawing the lease in the manner in which it was done to cover the unleased land. I communicated such back to my brother to whom I had sent the lease. He executed it and returned it and I delivered it."

He also testified at the time he made the Chapman and Porter lease: "I thought the Hog Pasture had 710 acres in it. I had thought that ever since my father owned it. * * * The first I knew that it contained less than 710 acres was when Mr. Martin reported his survey to me. As to whether it was before or after the execution of the 39 acre lease, well it was after the survey was made otherwise it would have been 50 acres as I leased them the balance of it."

It later developed that there was only 231 acres in the J. E. Keen tract.

After the execution and delivery of these leases, but before the lease upon which plaintiffs and interveners rely, J. E. Keen and wife conveyed a one-half interest in the minerals in and under all of the land material to this suit to the Robert Oil Corporation, and that interest was at the time of the suit owned by appellants, and also conveyed a one-fourth interest in the minerals under all the land material to this suit to R. Q. Jones, who conveyed it to J. E. Bridwell and L. C. Heyrick, by whom it was owned at the time of the suit, and who were not parties thereto.

These two conveyances to the Robert Oil Corporation and R. Q. Jones are the two royalty deeds later herein described; one being dated February 23, 1927, and the other dated November 25, 1927.

It is obvious that a lease covering the east

200 acres of the north 250 acres of any given tract of land, and a lease covering the west 39 acres of the north 239 acres of the same tract of land will, when laid out on a map, leave a small strip between, not included in either description. Mr. A. D. Montgomery, one of the plaintiffs (appellees herein), having occasion to examine the title to the Keen land for a client who was about to purchase an interest in the royalty, discovered this discrepancy and communicated it to appellee Jones, who went to Aspermont, Tex., and procured J. E. Keen and wife to execute a lease to Jones & Montgomery, on December 15, 1927, covering "all the interest we have in the North 250 acres of what is known as 'Fraction B' of the T E L Co. Survey No. 3401, and being all the land owned by the grantors in said survey. It is the intention of this instrument to cover all of said land on which there is no valid oil and gas lease at this time and containing 9 acres more or less."

Jones & Montgomery conveyed an interest in their rights under this last-mentioned lease to one George Abercrombi, and this suit was brought by Jones, Abercrombi, and Montgomery, as plaintiffs, against appellants, as defendants, for title and possession of the oil and gas leasehold interest covering the strip of land alleged to exist between the 200-acre lease and the 39-acre lease, which was described in the petition by metes and bounds and alleged to contain 8.85 acres.

In addition to the usual allegations of an action of trespass to try title, it was alleged that J. E. Keen and wife leased to Jones & Montgomery the specific tract of land described by metes and bounds in the petition, under the terms of which plaintiffs were entitled to receive $7/16$ of the total production of oil and/or gas, that plaintiffs drilled a well thereon and began producing oil which it was impossible to market because of claims asserted by the defendants, and it was prayed that these claims of the defendants be removed as a cloud on plaintiff's title. The defendants (appellants here) answered by general demurrer and general denial, and in addition and by way of cross-action (J. E. Keen being made a cross-defendant) alleged that the conveyances from J. M. Keen to J. E. Keen and Mrs. C. E. Graham were made for the purpose of dividing the "hog pasture," which he supposed to contain 710 acres, between his said son and daughter, in the proportion of $250/710$ and $460/710$ thereof; that the oil and gas lease to Chapman & Porter was intended by all parties to cover the east 200 acres of the tract acquired by J. E. Keen from J. M. Keen, and was so intended to cover 200 acres, regardless of the number of acres which the J. E. Keen land actually contained and further alleged that the description of said 200 acres as contained in the lease (the east 200 acres of the north 250 acres) was so inserted in the lease through the mutual mistake of the parties, all believing, contrary to

the facts, that the J. E. Keen land contained 250 acres.

It was further alleged that, some character of survey having been made, as a result of which it was determined that the tract of land originally owned by J. M. Keen measured less than 710 acres, so that the J. E. Keen tract measured proportionately less than 250 acres, and it being believed as a result of said survey that the J. E. Keen tract covered 239 acres, and it being desired and intended by the Robert Oil Corporation to acquire and by J. E. Keen to execute to it an oil and gas lease covering all the balance of his tract not included in the 200-acre lease, such lease was drawn and described the property covered, "the West 39 acres of the North 239 acres owned by J. E. Keen," etc.; that the purpose of this transaction in the minds of both Keen and the Robert Oil Corporation was to lease to the latter all of the tract which was not already covered by the 200-acre lease, and it was at all times the intention and the understanding of the respective lessees under the two oil and gas leases above mentioned and also of the said J. E. Keen that, by the execution and delivery of the two oil and gas leases hereinabove mentioned, one covering 200 acres and the other covering 39 acres, there was thereby leased to the respective lessees the entire tract of land acquired, as aforesaid, by J. E. Keen from J. M. Keen, and that, if the two leases do not include the whole of the J. E. Keen tract of land within the descriptions contained in the leases themselves, such misdescription in each of the leases was due to the mutual mistake and inadvertence of J. E. Keen and the respective lessee therein, to all of whose rights these defendants have succeeded.

It was further alleged that the plaintiffs, at the time of acquiring their pretended leases, well knew that such was the intention and understanding and that the defendants were claiming and were in possession of the oil and gas leasehold estate and the entire tract of land owned by J. E. Keen, or should and would have so known by the exercise of reasonable diligence, and further that the plaintiffs are estopped to make any claim to the oil and gas lease on the strip mentioned in their petition because the mineral conveyance from J. E. Keen to R. Q. Jones, one of the plaintiffs, conveying a one-fourth interest in the minerals under the entire Keen tract, expressly provided and recited that all of said land was subject to oil and gas leases in favor of Atlantic Oil & Producing Company, Robert Oil Corporation, Allday Oil Corporation, et al., meaning and expressly referring to the two oil and gas leases owned by the defendants, and because the plaintiff Montgomery, prior to the taking of said pretended lease, examined the abstract, and read said instrument, and was well acquainted with its provisions, and because the plaintiff Abercrombi had the abstract examined prior to his

purchase from Jones & Montgomery of an interest in said pretended lease, and his attorney read said instrument and knew the provisions thereof.

It was further alleged by the defendants that J. E. Keen recognized their ownership of the oil and gas leasehold estate covering all of his land in the mineral deed to the Robert Oil Corporation, which expressly recited and recognized that all of the west 125 acres of his land was under an oil and gas lease originally executed in favor of Robert Oil Corporation et al., all of which was well known to the plaintiff at the time they acquired their pretended oil and gas lease, and whereby they were estopped to claim any interest and estopped to claim that they were innocent purchasers.

It was further alleged that the plaintiffs were not innocent purchasers for value, because they paid nothing of value for their pretended oil and gas lease, and whatever they did was done with full knowledge of the claim of defendants to the ownership of the oil and gas lease covering the property in which they now assert an interest; and it was prayed that plaintiffs take nothing, that defendants be decreed to be the owner of the oil and gas leasehold estate under the whole of the J. E. Keen tract of land, that plaintiffs be adjudged to have no interest therein, that their pretended oil and gas lease be null and void, and same be removed as a cloud upon the title, and that the oil and gas leases originally executed to Chapman and Porter and to Robert Oil Corporation, respectively, be reformed, and for general relief.

The plaintiffs Jones & Montgomery filed a supplemental petition containing exceptions and a general denial and alleging that they became the owner of the oil and gas lease covering an undivided one-half interest in the minerals in the land described in their petition without notice of any of the facts averred in the answer; that the defendants had waived their right for reformation and were estopped to assert mutual mistake; that, at the time of their purchase, plaintiffs examined the record title, which showed that the defendants' leases did not cover the property claimed by the plaintiffs; and that in any event the plaintiffs were entitled to judgment for improvements placed by them upon the property.

Plaintiff Abercrombi also filed a supplemental petition adopting all of his coplaintiffs' pleading, and further alleging that he purchased from Jones & Montgomery an interest in their oil and gas lease without notice of any of the facts averred in defendant's pleading, paying therefor a substantial and valuable consideration, to wit, $1,500, in good faith; and he prayed for relief in the form of a judgment against Jones & Montgomery on their warranty in the event defendants should be successful. He also alleged that T. L. Looney was jointly interested with

him, and Mr. Looney became a party to the cause by intervention.

Trial was had before the court without a jury, and it was adjudged and decreed by the court as follows:

(1) Title to an undivided $7/16$ of all minerals in and under the 8.85 acres of land described in plaintiffs' petition was decreed out of the defendants (appellants) and vested in the plaintiffs (appellees); "said $7/16$ of said minerals being chargeable with $7/16$ of the reasonable cost of operation and/or development and/or equipment to said entire mineral estate."

(2) Title to an undivided $1/16$ royalty interest in the minerals under said strip, together with $7/16$ working interest therein, was vested in the defendants (appellants); the $1/16$ royalty interest being decreed not to be chargeable with any of the costs of operation or development but "said $7/16$ of said mineral estate being decreed to be chargeable with $7/16$ of the reasonable cost of operation and/or development and/or equipping said entire mineral estate."

(3) Title to an undivided $1/32$ royalty interest in the minerals under this strip was vested in J. E. Keen.

(4) Reformation of the two leases owned by defendants (appellants), being the 200-acre lease and the 39-acre lease, was expressly denied, and said instruments were decreed to cover and include only the respective lands therein described.

(5) Certain persons who had sought to intervene to recover for materials furnished the plaintiffs were denied relief.

(6) A receiver was appointed.

From this judgment, the defendants appeal. Findings and conclusions were not filed by the trial court.

The propositions upon which appellants predicate this appeal are as follows:

"(1) In view of the undisputed evidence that J. M. Keen considered his 'Hog Pasture' tract as containing 710 acres and executed conveyances to his son, J. E. Keen, of the North 250 acres, and his daughter, Mrs. C. E. Graham, of the South 460 acres on the same day and for the purpose of partitioning said land between them in that proportion, and the further undisputed evidence that said Hog Pasture tract contained 655.3 acres instead of 710 acres, the tract of land acquired by J. E. Keen under said deed from his father included only .231 acres instead of 250.

"(2) In view of the undisputed evidence that when the lease to Chapman and Porter was executed it was the purpose both of the lessors and lessees to cover thereby the East 200 acres of the tract of land acquired by J. E. Keen from his father (the land being described as the East 200 acres of the North 250 acres of the Hog Pasture tract because of the mutual mistake of the parties in believing that the tract of land owned by J. E. Keen comprised said North 250 acres),

the defendants herein were entitled to reformation of said lease as against J. E. Keen so as to make the same describe the land intended to be covered, to-wit: The East 200 acres of the tract owned by J. E. Keen out of Fraction B, T. E. L. Company Survey No. 3401.

"(3) In view of the undisputed evidence that it was the intention of the lessor and lessee in the lease from J. E. Keen to Robert Oil Corporation to cover and include thereby all of the J. E. Keen tract of land not theretofore covered by the oil and gas lease to Chapman and Porter and that the description contained in said lease, to-wit: 'The West 39 acres of the North 239 acres' was inserted therein through the mutual mistake of the parties, both believing (a) that the J. E. Keen land contained 239 acres, (b) that the lease to Chapman & Porter covered and included the East 200 acres thereof, and, (c) that the unleased land at that time owned by J. E. Keen was the West 39 acres thereof, the defendants were entitled to have the same reformed as against J. E. Keen so as to correctly describe the land mutually intended to be covered thereby, to-wit: All of tract of land out of Fraction 'B,' T. E. L. Co. Survey No. 3401 conveyed to J. E. Keen by his father J. M. Keen by deed dated October 23rd, 1919, except that portion of said tract covered by the lease from J. E. Keen to Chapman & Porter.

"(4) Appellants are entitled to the same right of reformation as against plaintiffs below to which they were entitled against J. E. Keen because the evidence shows conclusively that all of the plaintiffs below had knowledge prior to the time they acquired their pretended oil and gas lease and prior to the time they parted with any money or thing of value therefor; or in connection therewith, of facts sufficient to put them on inquiry as to the rights of appellants, i. e. of the fact that appellants were in actual possession of the strip now claimed by appellees not to be included in appellants' lease and of the fact that J. E. Keen recognized that said tract was included in appellants' lease, and especially of the fact that appellants were claiming that their two leases covered all of the J. E. Keen land, wherefore appellees are not in the attitude of bona fide purchasers.

"(5) Appellants are entitled to the same relief of reformation against the appellees to which they were entitled against J. E. Keen by reason of the fact that appellees are estopped to claim that appellants' leases, viz; the 200 acre lease and the 39 acre lease, do not cover all of the tract of land claimed by appellees because all of the appellees are in privity with R. Q. Jones, one of the appellees who received and accepted a mineral conveyance from J. E. Keen prior to the execution of appellees' pretended lease, expressly asserting and reciting that the land mentioned in appellees' petition was covered by appel-

lants' oil and gas leases and the said R. Q. Jones himself made a mineral deed to L. C. Heydrick and J. S. Bridwell asserting and reciting that said land was covered by appellants' oil and gas leases, whereby the said R. Q. Jones and the other appellees are estopped to deny the ownership by these appellants of the oil and gas leasehold estate in and to all of the J. E. Keen land."

Chas. N. Keen testified, and it is not disputed, that the two deeds executed by his father, J. M. Keen, dated October 23, 1929, the one to J. E. Keen and the other to Mrs. Graham were made for the purpose of partitioning the land between those children.

■ The hog pasture tract in fact containing less acreage than the deed purported to convey and having been made for the purpose of partition, the shortage in acreage should be apportioned between the grantees. Pearce v. City of Denver (Colo.) 6 L. R. A. 541; White v. Brocaw, 14 Ohio St. R. 344; McKelvain v. Allen, 58 Tex. 383, at page 387.

There can be no reasonable ground for holding that J. E. Keen got his full 250 acres while Mrs. Graham got considerably less acreage than her deed called for. The first proposition is sustained.

The next two propositions raise the question of the right of reformation by appellants against J. E. Keen. The first lease made by J. E. Keen was to Chapman & Porter, dated September 3, 1926, and purported to cover "the East 200 acres of the North 250 acres of the 710 acre tract formerly owned by J. M. Keen." At that time the land was what is known as "wildcat acreage." W. S. Ward, a witness for the defendant, testified that he was interested in the Chapman & Porter lease with the lessees; that he and Porter approached Charlie Keen (J. E. Keen's brother, who was attending to his brother's land in Young county, Tex.) about getting some acreage elsewhere; that same proved to be unavailable, but, in the course of the conversation, Charlie Keen mentioned that he could get them leases covering 325 acres if they would drill a well and put up a bonus of $500; and he stated that his brother would give 200 acres and his sister (Mrs. Graham) 125 acres. Witness and Porter went to look at the land, and, upon his return, had another conversation with Charlie Keen and C. E. Graham, husband of Mrs. Graham, and agreed that they were to get leases on 325 acres for $500 bonus and the drilling of a well—200 acres to be given by J. E. Keen and 125 acres by Mrs. Graham. Either Charlie Keen or Mr. Graham told them to go to the City National Bank of Olney and get the abstract in order to get the description of the land. Porter went to the bank, got the abstract, and wrote up a lease describing the 200 acres in accordance with the description as contained in the deed to J. E. Keen from his father. Charlie Keen sent this lease to his brother, and it was executed and returned. At the same time Mr. and Mrs. Graham made

Chapman & Porter a lease on 125 acres adjoining. Charlie Keen testified that in these negotiations it was agreed that Chapman & Porter were to get the lease on 200 acres off the east side of the J. E. Keen land "to drill a well on" and that at that time J. E. Keen "was supposed to own the North 250 acres." He testified that when the lease to Chapman & Porter was drawn up he mailed it to his brother, who .executed it and returned it to him, and that he delivered it and collected the money.

J. E. Keen testified that his brother Charlie Keen represented him in connection with these leases; that his brother made leases, reported them to him and he signed them; that he remembers his brother sending him the Chapman & Porter 200-acre lease and him signing and returning it; that he relied on his brother to attend to the matter and left it up to him; that his brother Charlie either wrote to him or called him up and told' him he had some parties who wanted to take some leases down there, and that Charlie sent him the Chapman & Porter lease; that he did not read the description, as he was depending on Charlie to keep that straight, but he understood it to contain 200 acres. He intended to lease Chapman & Porter 200 acres, and at that time thought he owned 250 acres.

The other lease made by J. A. Keen was the lease to the Robert Oil Corporation, dated November 12, 1926, covering the west 39 acres of the north 239 acres owned by J. E. Keen out of fraction B, T. E. L. Co. survey No. 3401. At that time Mr. Martin, surveyor at Olney, had reported to Charlie Keen that he thought there was only 239 acres in the J. E. Keen tract. Charles Keen testified that Mr. Welch of the Robert Oil Corporation came to see him about leasing the land, and "I told him I would lease him the balance of the land, that is, the balance of my brother's land and we thought at that time it was surveying out 39 acres that was not already covered with the lease, so we drew it up 'The West 39 acres of the North 239 acres.' It was reported that Eddie (referring to J. E. Keen) only had 231 acres and I reported it back to Mr. Welch who said that was all right, if he had paid for a little extra acreage let it go. When Welch came to me I agreed to lease him the balance of my brother's land unleased and we figured out at 39 acres. It was my intention in drawing the lease in the manner it was done to cover the unleased land. I communicated such back to my brother to whom I sent the lease. He executed it and returned it and I delivered it."

J. E. Keen testified that his brother represented him in connection with this lease, that he remembers Charlie's sending him the Robert Oil Corporation 39-acre lease, at which time "he thinks Charlie claimed to ,him that it (i. e., his tract of land) was short and that it (i. e., the 39-acre lease) was supposed to cover the amount that was left, the balance of the land unleased."

He further testified that his recollection was that he told appellee Jones, when the latter came to him in December to get the lease under which appellees in this suit claim some interest, that he had all of his land leased, but Jones convinced him that he really had 250 acres and had only leased 239 acres, and so procured him to execute the blanket lease on his land remaining unleased under which appellees in this suit make their claims.

At the time he executed the 39-acre lease, he thought he owned 239 acres and intended to lease 39 acres; Charlie told him that that was the balance of his land.

Mr. Welch, vice president of the Robert Oil Corporation, testified that he handled the transaction with Charles Keen in connection with the 39-acre lease made to his company. He stated that he met Charles Keen in the hotel at Olney, who explained to him that he had some land on the west side of the J. E. Keen tract on which he desired to make an oil and gas lease, and that he (Welch) agreed to buy the lease on the balance of the J. E. Keen land; that is, the portion not heretofore covered by the Porter & Chapman lease. Next day an escrow agreement was written up. At that time he asked Charlie Keen if 39 acres was all that was left, and Charlie explained to him that it was, that they had recently had it surveyed, and they described the 39 acres as set out in the lease. He stated that he would not have accepted the conveyance as written had not he thought that the 39 acres, as described, covered the balance of the J. E. Keen land; i. e., all that part thereof not covered by the lease to Chapman & Porter.

▌ From this undisputed evidence it is clear that, when the 200-acre lease to Porter & Chapman was made it was the intention of all parties that such lease should cover the east 200 acres of the land acquired by the lessor from his father J. M. Keen; and, at the time the 39-acre lease to the Robert Oil Corporation was made, it was the intention that it should cover the balance of the tract. However, at the time of the execution of both leases, the parties were laboring under a mutual mistake of fact as to the acreage of the tract. The descriptions used in the leases were based upon this mistake of fact, and by reason of such mistake the description did not cover all of the land intended to be leased.

Under these facts it is clear that, as against J. E. Keen, the original lessees are entitled to a reformation of the instruments so as to express the true intention and agreement of the parties. Texas Pac. Coal & Oil Co. v. Crabb (Tex. Com. App.) 249 S. W. 835; 23 R. C. L. 325; Maupin on Marketable Title (3d Ed.) 606; 34 Cyc. 937.

▌ In this connection it is objected that this equitable right of reformation did not

pass to appellants in the absence of plea and proof that the same equitable right attached to reformation of the descriptions in the mesne conveyances from Porter & Chapman to appellants. We think the equity works back through all the conveyances and gives to appellants as the last vendees the right of reformation against the original grantor J. E. Keen. 23 R. C. L. pp. 338, 339; 34 Cyc. 951, 952; Jones v. McNealy, 139 Ala. 378, 35 So. 1022, 101 Am. St. Rep. 38; Hagman v. Shaffner, 88 Mo. 24; Gwyer v. Spaulding, 33 Neb. 573, 50 N. W. 681. In any event, this objection does not apply to the right of the Robert Oil Corporation to reformation of the lease covering the 39 acres, for such corporation was the original lessee in that instrument.

Nor is there any merit in the assertion that appellants are not entitled to reformation because they did not offer to do equity. This assertion is predicated upon testimony that the 39-acre lease was made upon the basis of $15 per acre to be paid by the lessee. However, the present owners of the 200-acre lease are first entitled to reformation, and when that lease is reformed so as to express the true intention of the parties, it will cover the disputed strip.

Furthermore, it appears the 200-acre tract was leased for a consideration of $500. When the 39-acre tract was leased, $15 per acre was paid. It thus appears that Keen was paid for leases to cover 239 acres, when he has only 231 acres. He has in fact been overpaid to the extent of 8 acres.

Appellants' right of reformation exists also against appellees Jones, Montgomery, Abercrombi, and Looney, unless they are protected as bona fide purchasers for value and without notice actual or constructive. 23 R. C. L. 339.

The lease by J. E. Keen to Jones & Montgomery is dated December 15, 1927. The assignment from Jones & Montgomery to Abercrombi is dated December 14, 1928. Abercrombi later assigned an interest to Looney. On February 23, 1927, J. E. Keen and wife executed a royalty deed to the Robert Oil Corporation, which was filed for record February 24, 1927, covering the following land:

"An undivided one-half interest in and to the oil, gas and other minerals in and under and that may be produced from the following described lands situated in Young County, Texas, to-wit:

"The 'West 125 acres of the North 250 acres more or less of Fraction B, T. E. & L. Company's Survey No. 3401 in Young County, Texas."

Among the recitations in said deed is the following: "And said above described land being now under an oil and gas lease originally executed in favor of Robert Oil Corporation et al. and now held by Robert Oil Corporation et al., it is understood and agreed that this sale is made subject to said lease but covers and includes one-half of all the oil royalty and

gas rental or royalty due and to be paid under the terms of said lease."

By royalty deed dated November 25, 1927, filed for record December 10, 1927, J. E. Keen and wife conveyed to appellee R. Q. Jones the following, to wit:

"One fourth interest in and to all of the oil, gas and other minerals in and under and that may be produced from the following described lands situated in Young County, Texas, to-wit:

"Being out of T. E. & L. Company Survey No. 3401, said county and being the North two hundred and thirty one (231) acres of Fraction 'B' of said survey, and being all of the land owned by the grantor in said survey."

This deed recited: "And said above described lands being now under an oil and gas lease originally executed in favor of Atlantic Oil Producing Company, Roberts Oil Corporation, Allday Oil Corporation, and others it is understood and agreed that this sale is made subject to said lease, but covers and includes a fourth of all the oil royalty and gas rental or royalty due and to be paid under the terms of said lease."

It was agreed by all parties that, prior to obtaining the oil and gas lease from Keen covering his supposed unleased land, A. D. Montgomery, one of the appellees, had examined an abstract of title down to and including the royalty deed from Keen to R. Q. Jones, and that W. E. Forgy, representing Abercrombi and Looney, likewise examined an abstract of title.

It is shown that W. E. Forgy, who examined the title for Abercrombi and Looney, saw in the abstract the mineral deed from Keen to Robert Oil Corporation, heretofore referred to, and which recited that the land was covered by lease. Abercrombi himself testified that before he and Looney bought the lease they went down on the ground and saw oil wells which he supposed belonged to the Robert Oil Corporation on both sides of the so-called disputed strip, and rod lines and flow lines upon and across said strip. J. E. Keen testified that at the time Jones came to him to get the lease he told him that all of his land was leased, and "tried to convince Jones that he had leased every foot that he had."

It was shown that R. Q. Jones made application to the Railroad Commission for permit to drill a well on the so disputed strip, and that a hearing was had on that application at Austin, at which Mr. Montgomery was present, and at which a protest was filed by appellants claiming said tract, and that the permit granted by the Railroad Commission was expressly made "subject to the condition that applicant can establish a valid lease to the premises and without prejudice to the rights of anyone claiming prior leases upon the said land."

It was shown that appellants had oil wells upon the land covered by their leases for some time prior to the time Keen leased the

disputed strip to Jones & Montgomery, and appellants had two producing wells on the J. E. Keen land, one close to the disputed strip to the west, and one close to it to the east, and maintained a battery of flow tanks, together with power and pull rods, and that there were flow lines and pull rods running across the disputed strip which had been there for a number of months prior to the hearing before the Railroad Commission, and were there prior to the time appellees obtained their lease.

Appellee Abercrombi testified that, before trading with Jones & Montgomery for a half interest in their lease, he and Looney drove down there and looked over the lease. He said that he knew Allday and Clark, and that they lived in Wichita Falls, and knew that the Robert Oil Corporation was located at Breckenridge, that they owned an interest in the minerals, but that he made no inquiry as to why the lease that Jones & Montgomery had did not cover but an undivided interest in the property. He also said that "it did not occur to him that the Robert Oil Corporation, who had a lease on 250 acres wouldn't leave a strip of 187 feet through the middle of the lease; that it is a common occurrence that men sometimes overlook things."

Jones testified that he had been out on the property before he got the lease from Keen, under which appellees claim, that he knew some of the appellants, but, when he discovered what he supposed to be an unleased strip, in connection with the examination of the abstract by Mr. Montgomery for his royalty, went to Aspermont to get the lease from Keen, saying nothing to appellants.

Montgomery testified as to his examination of the abstract for Bridwell and Heydrick; as to the hearing before the Railroad Commission at which he was present before anything had been paid out for the lease, or in connection therewith, except $50 for a survey, and at which it was contended by appellants that appellees had no title; and he further stated that, in examining the abstract, he saw the deeds to J. E. Keen for the north 250 acres and to Mrs. Graham for the south 460 acres of a supposed 710-acre tract, and figured out that the tract really contained less than 710 acres, but nevertheless concluded that the shortage came out of Mrs. Graham's portion, and that J. E. Keen got a full 250 acres, that he drew the assignment from Jones & Montgomery to Abercrombi, and knew at that time that appellants claimed that appellees had no title, and therefore drew the assignment to Abercrombi "in the way it is worded in order to protect himself against this apparent claim."

We do not think the recitals above quoted in the royalty deeds of February 23, 1927, and November 25, 1927, operate as an estoppel against appellees, as is asserted in the fifth proposition. Appellees are not claiming under those deeds, and therefore not conclusively bound by recitals therein. However, the land described in these deeds embraces the strip here in dispute, and these recitals plainly show that Keen and wife considered the disputed strip was covered by the leases theretofore executed. The evidence shows appellees had actual notice of these recitals.

It is often difficult to determine what circumstances are sufficient to put a party on inquiry; and each case, in large measure, depends upon its own facts. Wethered's Adm'r v. Boon, 17 Tex. 143; Howard v. Kopperl, 74 Tex. 494, 5 S. W. 627. We are of the opinion the recitals in the royalty deeds, coupled with the other facts stated above, particularly the presence of the flow lines and pull rods upon and across the disputed strip, were sufficient as a matter of law to put appellees upon inquiry; and, if they had prosecuted such inquiry with reasonable diligence, they would unquestionably have learned of appellant's right and claim.

We have found no case directly in point, but in support generally of this conclusion see Littleton v. Giddings, 47 Tex. 109; Smith v. Adams, 4 Tex. Civ. App. 5, 23 S. W. 49, and S. W. Pipe Line Co. v. Empire Natural Gas Co. (C. C. A.) 33 F.(2d) 248.

We desire to acknowledge our indebtedness to counsel for all parties for the very able briefs submitted by them. We have been much aided thereby in the disposition of the appeal. In the preparation of this opinion, we have quoted liberally from the appellants' brief.

Reversed and remanded.